COUNTY OF SUFFOLK, a Municipal Corporation, Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco, William P. Quinn, Robert Hoffman, Susan Chase, Yolanda Owens, James Roth, Myra Berzoff and Sandra Rosenberg, on behalf of themselves and all others similarly situated, Plaintiffs,

County of Suffolk, a Municipal Corporation, Plaintiff–Appellant, Cross–Appellee,

United States ex rel. W. Gordon Dick and John P. Daly, Jr., Custom Extruders, Inc., Susan Chase, Christopher S. George, Fred Harrison, Robert Hoffman and William P. Quinn, Plaintiffs–Appellants,

Robert Alcorn, Peter Maniscalco, Yolanda Owens, James Roth, Myra Berzoff and Sandra Rosenberg, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees, Cross–Appellees,

Business Ratepayers and County of Nassau, Intervenors–Appellants,

v.

LONG ISLAND LIGHTING COMPANY, Stone & Webster Engineering Company, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford, Defendants,

Long Island Lighting Company, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford, Defendants–Appellees, Cross–Appellants.

Nos. 281–285, Dockets 89–7473, 89–7491, 89–7493, 89–7495 and 89–7527.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1989.

Decided June 29, 1990.

Kenneth F. McCallion, Bernard Persky, New York City (Gregory O'Neill, James W. Johnson, Lawrence P. Kolker, Hill, Betts & Nash, New York City, E. Thomas Boyle, Suffolk County Atty., Hauppauge, N.Y., of counsel), for plaintiff-appellant, cross-appellee County of Suffolk.

Irving Like, Babylon, N.Y. (Reilly, Like & Schneider, Babylon, N.Y., of counsel) and Edward Flower, Bay Shore, N.Y. (Daniel Friedman, Flower & Plotka, Bay Shore, N.Y., of counsel), for plaintiffs-appellants Custom Extruders, Inc., et al. and intervenor–appellant Business Ratepayers.

James D. Harmon, Jr., Esq., New York City (Steven J. Ahmuty, Jr., Michael J. Eng, Aaron F. Fishbein, Bower & Gardner, New York City, of counsel), for plaintiffs-appellants, cross-appellees U.S. States ex

rel. W. Gordon Dick and John P. Daly, Jr.

Michael Lesch, New York City (Ronald H. Alenstein, John G. Nicolich, David S. Tannenbaum, Maurice N. Ross, Barry V. Sautman, Shea & Gould, New York City, of counsel), for defendants-appellees, cross-appellants Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford.

Susan E. Silverman, Asst. Gen. Counsel, Long Island Lighting Co., Hicksville, N.Y., for defendant-appellee, cross-appellant Long Island Lighting Co.

Judith P. Vladeck, New York City (Karen Honeycutt, Julian R. Birnbaum, Roger J. Bernstein, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, of counsel), for plaintiffs-appellees, cross-appellees Robert Alcorn, et al.

George J. Farrell, Jr., Uniondale, N.Y. (Dolores Fredrich, Russell J. Karpp, Judith Hepworth, Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, P.C., Uniondale, N.Y., Edward T. O'Brien, Nassau County Atty., Mineola, N.Y., of counsel), for intervenor–appellant County of Nassau.

Theodore B. Olson, Terence P. Ross, Lisolette E. Mitz, Gibson, Dunn & Crutcher, Washington, D.C., Daniel J. Popeo, Paul D. Kamenar, Alan M. Slobodin, Washington Legal Foundation, Washington, D.C., for amici curiae Washington Legal Foundation and Allied Educational Foundation.

G. Robert Blakey, South Bend, Ind., Bruce A. Hubbard, Cornwell & Blakey, Denver, Colo., Priscilla Budeiri, Trial Lawyers for Public Justice, P.C., for amici curiae Trial Lawyers for Public Justice, P.C., and Nat. Institute of Municipal Law Officers.

Before VAN GRAAFEILAND, CARDAMONE and PIERCE, Circuit Judges.

PIERCE, Senior Circuit Judge:

These appeals and cross-appeals represent another in a series of disputes involving the Shoreham Nuclear Power Station ("Shoreham").[1] Numerous issues are presented for review.

Although relying on different reasons, we affirm the district court's grant of judgment notwithstanding the verdict in favor of the Long Island Lighting Company ("LILCO") following a two-month trial in which the County of Suffolk ("Suffolk") sued LILCO in the United States District Court for the Eastern District of New York, Weinstein, *Judge*. We also affirm the district court's approval of the class action settlement that was reached between counsel for LILCO and class counsel (representing LILCO ratepayers other than Suffolk) after the grant of judgment n.o.v. in favor of LILCO. We reverse the district court's denial of Suffolk's application for attorneys' fees, and we remand for the limited purpose of determining the amount of the fee award to which Suffolk is reasonably entitled.

## BACKGROUND

In 1969, LILCO—a regulated utility serving approximately 1,000,000 customers on Long Island—announced its plan to build an 820 megawatt nuclear power plant at Shoreham, Long Island. At that time, the cost of the Shoreham Nuclear Power Station's construction was estimated by LILCO at $217 million, and commercial operation of the plant was projected for May 1975. Both of these predictions proved to be exceedingly optimistic. Costs eventually escalated to over five billion dollars; moreover, as a result of a 1989 non-judicial settlement agreement reached between LILCO and New York State, it now ap-

---

1. A partial listing of reported cases includes the following: *Long Island Lighting Co. v. Town of Brookhaven,* 889 F.2d 428 (2d Cir.1989); *Long Island Lighting Co. v. Cuomo,* 888 F.2d 230 (2d Cir.1989); *Massachusetts v. United States,* 856 F.2d 378 (1st Cir.1988); *Citizens for an Orderly Energy Policy, Inc. v. County of Suffolk,* 813 F.2d 570 (2d Cir.1987); *Cuomo v. United States Nu-* *clear Regulatory Comm'n,* 772 F.2d 972 (D.C.Cir. 1985); *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52 (2d Cir.1984); *Long Island Lighting Co. v. County of Suffolk,* 628 F.Supp. 654 (E.D.N.Y.1986); *Long Island Lighting Co. v. County of Suffolk,* 119 A.D.2d 128, 505 N.Y.S.2d 956 (2d Dep't 1986).

pears that Shoreham will not be put into commercial operation at all. *See In re Long Island Lighting Co.*, 101 P.U.R.4th 81 (NYPSC 1989) (detailing LILCO–New York State settlement agreement).

Initially, the costs of Shoreham were not factored into the rates LILCO charged its customers. According to expert testimony given at the LILCO–Suffolk trial herein, this was standard practice: "The basic rule of regulation is that customers should only be charged for plants [currently producing energy]"; "[c]harges for plants not in operation are unusual." Beginning in 1974, however, notwithstanding Shoreham's incomplete status, LILCO sought rate increases based, in part, upon Shoreham's construction costs.

The procedure for accomplishing this required LILCO to file a detailed application for a rate increase with the New York State Public Service Commission ("PSC"). The PSC—a commission consisting of from five to seven members appointed by the state's governor "by and with the advice and consent of the senate," N.Y.Pub. Serv.Law § 4(1) (McKinney 1989)—is authorized to approve such applications to the extent they are "just and reasonable," *id.* § 66(12). In the course of determining whether a rate increase is justified, public hearings are held at which interested parties may submit written briefs and testify under oath as to the appropriateness of the proposed rate increase. Thereafter, an Administrative Law Judge ("ALJ") files a written opinion addressing the matter. Additional briefs may be submitted in response to the ALJ's opinion. Finally, the PSC itself renders a decision. Utilizing this process, LILCO applied for and received numerous rate increases from 1974 onward.

On March 3, 1987, a putative class action suit was filed by Suffolk, five individual ratepayers, and Customs Extruders, Inc., a business corporation, against LILCO and certain of its former officers (collectively, "the LILCO defendants"). The proposed class consisted of all LILCO ratepayers from 1974 to the present. The gravamen of the plaintiffs' complaint was that, during the ratemaking process outlined above, the LILCO defendants repeatedly testified falsely to the PSC about Shoreham's construction status and anticipated commercial operation date,[2] and thereby caused the PSC to grant LILCO unwarranted and excessive rate increases. The plaintiffs' allegations focused on eight separate PSC proceedings held between 1975 and 1985. The amended complaint (dated May 1, 1987) asserted that the conduct of the LILCO defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1988) ("RICO") and New York State common law under theories of implied contract and unjust enrichment. The amended complaint also added as a defendant Stone & Webster Engineering Corp. ("Stone & Webster"), Shoreham's architect and engineer.

On September 6, 1988, the district judge denied the plaintiffs' motion for class certification on the ground that " 'the representative parties' will not 'fairly and adequately protect the interests of the class.' " *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1405, 1406 (E.D.N.Y. 1989) (quoting Fed.R.Civ.P. 23(a)(4)).[3] The plaintiffs continued to prosecute the action in their individual capacities. On September 19, 1988, in an effort to simplify and expedite the upcoming trial, the district judge (1) dismissed without prejudice the plaintiffs' pendent state law claims, and (2) severed the trial of Suffolk's RICO claims

---

**2.** The plaintiffs also alleged that the LILCO defendants testified falsely about the projected commercial operation date of two nuclear power stations at Jamesport, New York. However, at the trial of *Suffolk v. LILCO et al.* these allegations were rejected by the jury, and no aspect of LILCO's alleged misconduct in the Jamesport-related proceedings is at issue on this appeal.

**3.** In the case herein appealed, *County of Suffolk v. Long Island Lighting Co.*, the district court published eight opinions in Volume 710 of the Federal Supplement. *See* 710 F.Supp. 1387; 710 F.Supp. 1405; 710 F.Supp. 1406; 710 F.Supp. 1407; 710 F.Supp. 1422; 710 F.Supp. 1428; 710 F.Supp. 1477; and 710 F.Supp. 1487. Hereinafter, all references to these opinions will be short-cited and will omit mention of the case name.

from the trial of the RICO claims of the other plaintiffs. Four days later, Suffolk settled its claims against Stone & Webster.

The LILCO–Suffolk trial on Suffolk's RICO claims commenced before Judge Weinstein and a jury on October 3, 1988. Although the district judge thought at the close of the evidence that "the case [was] so thin that it probably [couldn't] stand up," on December 1, 1988, he charged the jurors and instructed them to begin their deliberations. On December 5, 1988, the jury returned a verdict finding that LILCO and defendant Wilfred Uhl, a Senior Vice–President of LILCO from April 1974 to December 1977 and President of LILCO from January 1978 to March 1984, had committed fraud in three PSC proceedings: (1) the 1977–78 Rate Case; (2) the 1983–84 Rate Case; and (3) the 1979–85 Shoreham Prudence Proceeding. *See generally infra* Part II. The jury also concluded that the other defendants—Charles R. Pierce, who, between 1974 and 1977, served as a Senior Vice–President and President of LILCO, after which he served, until 1984, as Chairman of LILCO's Board of Directors; Charles J. Davis, a LILCO Vice–President during pertinent periods herein; and Andrew W. Wofford, also a LILCO Vice–President during pertinent periods herein—had not committed fraud in any of the eight PSC proceedings. The jury assessed Suffolk's damages against LILCO and Uhl at $7,647,243 (approximately $22.9 million after trebling under RICO).

During trial, the district judge *sua sponte* severed for a bench trial the LILCO defendants' contention that Suffolk had caused or contributed substantially to its own damages by delaying the operation of Shoreham. This contention was characterized by the district judge as an "equitable defense." On February 11, 1989, after a four-day bench trial, the district court dismissed the defense on the ground that Suffolk's conduct was protected by the first amendment. 710 F.Supp. at 1389–90. On the same day, the district court also (1) denied the LILCO defendants' motion for judgment n.o.v. based on a claim of insufficiency of the evidence, and (2) granted the LILCO defendants' motion for judgment

n.o.v. as a matter of statutory construction of the RICO Act. In concluding "that RICO does not apply to this case," *id.* at 1393, the district court relied on the doctrine of "clear statement," *id.* at 1400. As explained by the district court,

> Because of the expansive reach of federal power under the Commerce Clause, the Supreme Court is wary of applying congressional legislation to areas that Congress probably did not intend to reach. When application of legislation in particular situations might alter the federal-state balance, the Court looks for a "clear statement that Congress intended to exercise its ... power in full." [L. Tribe, American Constitutional Law 316 (2d ed. 1988) ]. This occurs most notably ... when state institutional interests are threatened. The purpose of the doctrine is to ensure that federal legislation is not applied in a manner that may alter the delicate balance of federal and state power unless Congress has carefully considered and fully intended such a result.
>
> ....
>
> The "clear statement" doctrine indicates that in this case federal review through RICO of state regulatory decisions is inappropriate.... To apply the statute to the facts of the present case would ... lead to ... the intrusion of federal authority into an area historically reserved to state control [, *i.e.*, the regulation of local utility rates]. In such a situation the "clear statement" doctrine and the federalism concerns that underlie it are properly invoked.

*Id.* at 1400, 1402–03 (citations omitted).

On February 13, 1989, two days after dismissing Suffolk's RICO claim, the district court (1) certified a mandatory class of "[a]ll persons who were ratepayers of [LILCO] at any time during the period January 1, 1974, through the present and also those who are or will be ratepayers of [LILCO]," 710 F.Supp. at 1424; (2) ruled that Suffolk would be permitted to opt out of the class; (3) found that original plaintiffs Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco and William P. Quinn, and three added plaintiffs,

Robert Hoffman, Susan Chase, and Yolanda Owens, were adequate representatives of the class; (4) designated Judith P. Vladeck, Esq., as attorney for the ratepayer class ("class counsel"); (5) granted motions to intervene by various intervenors, including the County of Nassau and a group of "Business Ratepayers"; and (6) denied motions for class certification by certain intervenors.

On February 15, 1989, the district judge announced that the LILCO defendants had reached a tentative settlement agreement with the class representatives, 710 F.Supp. at 1424, providing for, among other things, payment of $390 million to the class in the form of rate reductions over a ten-year period; the creation of a Citizens Advisory Panel to aid in improving LILCO service; payment of up to $10 million in attorneys' fees for plaintiffs; and the release of "[a]ll causes of action arising from the RICO complaint...." On February 27, 1989, class counsel and LILCO's counsel executed a Stipulation of Partial Settlement, which, pursuant to the agreement announced by the court on February 15, set forth with more specificity the settlement between the parties. *See* 710 F.Supp. at 1452–66. Judge Weinstein held fairness hearings on the proposed settlement agreement on March 1, 3, 8, and 9, 1989. At the conclusion of the March 9 hearing, pursuant to the court's earlier invitation, Suffolk filed notice that it was opting out of the class of ratepayers.

On March 22, 1989, the district court approved the proposed class settlement, 710 F.Supp. 1428; the court also rejected Suffolk's application for attorneys' fees, 710 F.Supp. at 1448–49. The next day the court awarded attorneys' fees and expenses to class counsel, to counsel for three intervenors who opposed the settlement, to counsel for the United States in a related *qui tam* action, and to a court-appointed mediator. 710 F.Supp. 1477.

A single final judgment embodying the foregoing was entered on April 14, 1989. 710 F.Supp. 1487.

## DISCUSSION

In Part I of this opinion, we consider (1) whether the district court improperly permitted Suffolk to exclude itself from a mandatory class of ratepayers certified under Federal Rule of Civil Procedure 23(b)(1)(B); (2) whether RICO may be applied to fraudulent conduct committed by state-regulated utilities; and (3) whether, if RICO may be applied to such conduct, the doctrines of *Burford* abstention or primary jurisdiction require dismissal of Suffolk's RICO claims.

In Part II, we consider the contention of LILCO and Uhl that they are entitled to judgment n.o.v. based on the insufficiency of Suffolk's evidence.

Finally, in Part III, we consider the fairness of the settlement agreement and various related issues.

### I.

#### A.

We review first the district court's decision to allow Suffolk to opt out of the mandatory class of ratepayers certified pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). 710 F.Supp. at 1420–21. LILCO contends that the district court's ruling is supported neither by case law nor the rationale or language of Rule 23. The import of a reversal of the district court on this issue would be to moot Suffolk's independent appeal, since, if Suffolk could not have properly opted out of the mandatory class, it is bound by the class settlement if it is upheld, as are all other members of the class. Although we view it as a close question, we believe Rule 23 does authorize a district court to allow a class member to opt out of a Rule 23(b)(1)(B) class action under some circumstances; further, we believe Judge Weinstein acted within his discretion in allowing Suffolk to opt out under the circumstances of this case.

Rule 23(b) states in pertinent part:

(b) **Class Actions Maintainable.** An action may be maintained as a class ac-

tion if the prerequisites of subdivision (a) are satisfied,[4] and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

. . . . ,

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]

Fed.R.Civ.P. 23(b).

The rule is intended to apply "when claims are made by numerous persons against a fund insufficient to satisfy all claims." Fed.R.Civ.P. 23(b)(1)(B) advisory committee's note, 39 F.R.D. 69, 101 (1966). Under such circumstances, Rule 23(b)(1)(B) "is designed to preserve the limited fund for the entire class against the individual claims of class members," *Waldron v. Raymark Indus., Inc.*, 124 F.R.D. 235, 238 n. 1 (N.D.Ga.1989), which claims might otherwise exhaust the limited fund and thereby leave subsequent plaintiffs with no remedy, *see id.* at 237.

LILCO derives support for its argument against the existence of Rule 23(b)(1)(B) opt-out rights from case law, the Rule's rationale, and the Rule's text. Addressing these arguments seriatim, we note that several cases cited by LILCO do contain some language apparently supportive of its position. *See, e.g., In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir.) (" 'no member has the right to opt out in a (b)(1) or (b)(2) suit' ") (quoting J. Moore & J. Kennedy, 3B Moore's Federal Practice ¶ 23.31[3], at 236–37 (2d ed. 1987)), *cert. denied,* — U.S. —, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1544 (11th Cir.1987) ("Members of a (b)(3) class, but not those of a (b)(1) class, may choose to opt out...."); *In re School Asbestos Litig.*, 789 F.2d 996, 1002

(3d Cir.) ("the most significant aspect of [a (b)(1)(B) ] class is its mandatory character. All those who come within the description in the certification become, and must remain, members of the class because no opt-out provision exists."), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 & 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986); *Van Gemert v. Boeing Co.*, 590 F.2d 433, 438 n. 11 (2d Cir.1978) (in banc) ("No class member could have opted out of [this Rule 23(b)(1) class] even if he had desired to do so...."), *aff'd,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Larionoff v. United States*, 533 F.2d 1167, 1186 n. 44 (D.C.Cir.1976) ("class members in Rule 23(b)(1) and Rule 23(b)(2) actions are not provided an opportunity by the rule to exclude themselves from the action"), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). However, we note also that a leading commentator on the subject of class actions has stated that while under Rule 23(b)(1) and (b)(2) there is no *absolute* right to opt out, as there is under Rule 23(b)(3), courts do "have the discretionary power to allow exclusion." 3 H. Newberg, *Newberg On Class Actions* § 16.17; *see also* Greenfield, *Class Actions and Other Representative Litigation,* in *Federal Civil Practice* 294–95 (G. Vairo ed. 1989). We are in accord with the view that courts have narrow discretionary power to allow exclusion, and we believe that the above-cited cases, to the extent they indicate that the right to opt out does not exist, hold only that the right may not be exercised *solely* at the instance of the party seeking to opt out. These cases do not address the question at issue here: whether a class member may opt out of a (b)(1)(B) action at the invitation of the district court. Thus, despite LILCO's cited authorities, we consider the question to be an open one.

LILCO next addresses the rationale for Rule 23(b)(1)(B), and suggests that construing the Rule to authorize a limited opt-out

---

**4.** Subdivision (a) of Rule 23 provides:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there

are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

right ignores the reason the Rule 23(b)(1)(B) limited fund class action was created. The district court found this an appropriate case for certification pursuant to Rule 23(b)(1)(B) because "there [was] a high probability that not all possible RICO claimants could be paid in full [if the plaintiffs prevailed on their claims]." 710 F.Supp. at 1418. LILCO asserts that by permitting Suffolk alone to opt out of the mandatory ratepayer class, class members could be relegated to collecting only their proportionate share of the limited fund, while Suffolk could collect the full amount of any judgment, and argues that "Rule 23(b)(1)(B) avoids precisely such an injustice to class members by providing no exceptions...."

In determining whether Rule 23(b)(1)(B) can *ever* be construed to allow a party to opt out, we do not find LILCO's argument persuasive. Circumstances may well exist, *see infra*, whereby allowing a single class member the option of exclusion from a class would not "substantially impair or impede [the ability of class members] to protect their interests." Fed.R.Civ.P. 23(b)(1)(B). Thus, while the policy concern advanced by LILCO is persuasive to the extent that it supports the conclusion that a district court *usually* should not allow a Rule 23(b)(1)(B) class member to opt out, due consideration for that concern does not require that a district court *never* be allowed to permit it.

Finally, while Judge Weinstein derived his authority to allow Suffolk to opt out from Rule 23(d), LILCO contends that no provision of the Rule can be construed to permit a plaintiff to opt out of a mandatory class. We disagree. Without expressing a view as to the applicability of any other subsection of Rule 23(d), we believe subsection (5), which authorizes a district court to make appropriate orders "dealing with similar procedural matters," can be construed to provide the requisite authority.[5] Utilizing the maxim *ejusdem generis*, LILCO interprets "similar procedural matters" narrowly to exclude the authority to allow a class member to opt out of a Rule 23(b)(1)(B) class action. We believe LILCO's reliance on the ancient maxim is misplaced. The purpose of Rule 23(d) is to provide the district court with the means for facilitating "the fair and efficient conduct of the action." Fed.R.Civ.P. 23(d) advisory committee's note, 39 F.R.D. 69, 106 (1966). The command of Rule 1 of the Federal Rules of Civil Procedure leads us to construe the text of Rule 23(d) liberally to accomplish this end. *See* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1029, at 121 (2d ed. 1987). Since we believe that there are instances in which fairness would support a district court's decision to allow a Rule 23(b)(1)(B) plaintiff to opt out, as here, adoption of LILCO's narrow interpretation of Rule 23(d) would contravene Rule 1's command. Rule 1 takes precedence over maxims of construction, such as *ejusdem generis*, to the extent that its application does not lead to "a construction that ignores the plain meaning of a rule or fails to view it as part of the total procedural system." *See* 4 C. Wright & A. Miller, *supra*, § 1029, at 122–23.

In our view, a district court, in a proper case and in the exercise of sound discretion, may allow a class member to opt out of a limited fund class action under Rule

---

5. Rule 23(d) provides that:

 **(d) Orders in Conduct of Actions.** In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time.

23(b)(1)(B) in order to facilitate "the fair and efficient conduct of the action." Whether it was appropriate for the district judge to exercise this authority in this instance is a question we address using an abuse of discretion standard. We hold that Judge Weinstein did not abuse his discretion. His determination that "basic fairness" required giving Suffolk the option to exclude itself from the class, 710 F.Supp. at 1421, is supported amply by the fact that "the situation of Suffolk and the procedural posture of its claims [were] distinguishable from the general class. At great expense Suffolk litigated its claims and obtained a jury verdict in its favor." *Id.* The record also supports Judge Weinstein's belief that "permitting [Suffolk] to opt out could not jeopardize the class's ability to recover its settlement amount...." *Id.* Moreover, even if the class did not settle, we perceive no reason to conclude that Suffolk's maximum recovery of $22.9 million plus attorneys' fees could have *"substantially* impair[ed] or impede[d] [the class members'] ability to protect their interests." Fed.R.Civ.P. 23(b)(1)(B) (emphasis added). The determination that the class's ability to recover could not be substantially impaired by either a settlement or a judgment on the verdict for Suffolk eliminates from consideration an overriding reason for not allowing Suffolk to exclude itself from the class action, *i.e.,* the loss of the benefit intended to be gained by Rule 23(b)(1)(B) certification. Further, the determination that the situation of Suffolk herein was distinguishable from that of the general class provides a sound reason for authorizing precisely such a step, to wit, "basic fairness." Combined, these two determinations provided a strong basis for permitting Suffolk to opt out; consequently, we conclude Judge Weinstein acted within the bounds of his discretionary authority in granting permission to Suffolk to opt out.

### B.

■ We address now the ground upon which the district court based its decision to grant judgment n.o.v.: the inapplicability of RICO to public utilities. Relying upon the doctrine of clear statement, the district court held "RICO does not apply to a ... case such as [this]," and accordingly dismissed Suffolk's RICO claim. 710 F.Supp. at 1405. We disagree with the district court, and hold that public utilities, such as LILCO, are subject to the strictures of RICO.

The issue of the applicability of RICO against a state-regulated public utility in the context of a claim of fraud in the ratemaking process poses a difficult question. We assume familiarity with Judge Weinstein's thorough opinion, 710 F.Supp. 1387, which at least two federal district courts have found persuasive. *H.J., Inc. v. Northwestern Bell Tel. Co.,* 734 F.Supp. 879, 883–88 (D.Minn.1990), *on remand from,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Carr v. The Southern Co.,* 731 F.Supp. 1067 (S.D.Ga.1990).

As far as the issue of whether RICO applies to public utilities is concerned, as the district court noted, "[n]o specific language in RICO is ambiguous," 710 F.Supp. at 1400; no specific language suggests, even remotely, that there is a public utility exception to RICO's general applicability. The statute simply prohibits "any person" from violating its proscriptions, 18 U.S.C. § 1962, and "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property," *id.* § 1961(3). LILCO is unquestionably such an entity. Moreover, the legislative history is silent on the issue of a public utility exception. The confluence of these two facts presents LILCO with a substantial obstacle to overcome if it is to prevail on this issue since unambiguous statutory language, "in the absence of 'a clearly expressed legislative intent to the contrary, ... must ordinarily be regarded as conclusive,'" *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). LILCO's task is made all the more formidable by Congress's "express admonition that RICO is to be 'liberally construed to effectuate its remedial

purposes,' Pub.L. 91–452, § 904(a), 84 Stat. 947," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985); *see Turkette*, 452 U.S. at 587, 101 S.Ct. at 2530; *Beauford v. Helmsley*, 865 F.2d 1386, 1393 (2d Cir.) (in banc), *vacated and remanded*, — U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584, *adhered to upon further consideration*, 893 F.2d 1433 (2d Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). The district judge was of the opinion that the clear statement doctrine provided a sufficient means to overcome the obstacle presented by the plain language of the statute and the silence of its legislative history, and that because RICO's application "to the facts of the present case would ... lead to ... the intrusion of federal authority into an area historically reserved to state control," it was proper to invoke the doctrine. 710 F.Supp. at 1403. We disagree. In our view, application of the clear statement doctrine under the circumstances herein would represent an expansion of the doctrine which is not warranted by the facts of this case.

◼ Preliminarily, we note that the clear statement doctrine is simply a tool of statutory construction, designed "to ensure that federal legislation is not applied in a manner that may alter the delicate balance of federal and state power unless Congress has carefully considered and fully intended such a result." 710 F.Supp. at 1400. The Supreme Court has applied the doctrine on occasion; the Court has also stated that "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980). We believe that the interpretative rule enunciated in *Harrison* controls our resolution of the RICO issue presented herein, and that the clear statement doctrine is not properly applied to the facts of this case.

The rule stated in *Harrison* applies when the answer to the disputed issue is "obvious on the face of a statute." In contrast, as applied by the Supreme Court in cases discussed hereinbelow, the clear statement doctrine assumes importance in circumstances in which the language of a statute or its legislative history provide some indication of ambiguity, *see* Eskridge, *Public Values in Statutory Interpretation*, 137 U.Pa.L.Rev. 1007, 1065 (1989) ("A clear statement rule might tip the scales in a case where, absent the rule, the interpreter would say it is slightly more probable ... that Congress intended the other interpretation."), as well as in circumstances in which the doctrine's application suggests an interpretation of a statute *in accord with* the ordinary meaning of the statute's language or legislative history. Since there is no ambiguity in the relevant portion of the RICO statute or its legislative history, and application of the doctrine would result in an interpretation *at odds with* the plain meaning of the statutory language, we conclude that the doctrine is not applicable in this case.

A review of the Supreme Court cases cited by the district court and LILCO in support of the view that the clear statement doctrine should be invoked herein is illustrative of the limits of the doctrine's scope. In *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881 (1941), the Court decided that the Federal Trade Commission was without authority to prevent a candy manufacturer within a state from selling, wholly within that state, candy in so-called "break and take" packages, which made the amount of product the purchaser received dependent upon chance. Although the Court did state "[a]n inroad upon local conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress," *id.* at 355, 61 S.Ct. at 583, it also noted that the language of the statute supported its decision, *id.* at 351, 61 S.Ct. at 581.

Similarly, while the Court stated in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977),

that "[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities [by reading section 10(b) of the Securities Exchange Act of 1934 to provide a private remedy for the breach of corporate fiduciary duty alleged by the plaintiff]," *id.* at 479, 97 S.Ct. at 1304, it also stated that "[t]he language of the statute is ... 'sufficiently clear in its context' to be dispositive here," *id.* at 477, 97 S.Ct. at 1302 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1385, 47 L.Ed.2d 668 (1976)). Thus, in both *Santa Fe Industries* and *Bunte Bros.,* the clear statement doctrine was used to provide additional support for a decision already supported by the statutory language. *Cf. Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 642–45, 106 S.Ct. 2101, 2120–22, 90 L.Ed.2d 584 (1986) (regulation invalidated because of lack of any evidentiary basis for finding rational relationship between regulation and authorizing statute; need for such evidence particularly acute where traditional state interests implicated). The contrast with the instant case, where the statutory language provides no support for the district court's position, appears to us to be obvious.

Equally distinguishable from this case are those cases in which the statutory language was ambiguous and the Court relied on the clear statement doctrine to resolve the ambiguity. For example, in *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), the Court held that restitution obligations imposed upon a defendant in a state criminal proceeding are nondischargeable obligations under § 523(a)(7) of the Bankruptcy Act of 1978. In *Kelly,* the Court viewed the statutory language as ambiguous, and the legislative

history as inconclusive. *Id.* at 50–51 & n. 13, 107 S.Ct. at 361–62 & n. 13. Under these circumstances, the Court's interpretation of § 523(a)(7) properly was informed by "the States' interest in administering their criminal justice systems free from federal interference...." *Id.* at 49, 107 S.Ct. at 360; *see also United States v. Bass,* 404 U.S. 336, 339–50, 92 S.Ct. 515, 518–24, 30 L.Ed.2d 488 (1971) (concluding statutory language was ambiguous and legislative history unclear, Court adopted interpretation "dictated" by rule of lenity and clear statement doctrine); *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 147–52, 64 S.Ct. 474, 476–79, 88 L.Ed. 635 (1944) (among other things, Court relies on clear statement doctrine in interpreting ambiguous statute); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (conceding "the vagueness of [the Sherman Act's] language," Court makes single apparent reference to clear statement doctrine in adopting restrictive interpretation primarily based on legislative history). Here, since the statute is not ambiguous, reliance upon *Kelly, Bass, Davies Warehouse,* or *Apex Hosiery* is unwarranted.[6] *See Pennsylvania Dep't of Public Welfare v. Davenport,* —— U.S. ——, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (in concluding restitution obligations imposed in state criminal proceedings are dischargeable debts under Chapter 13 of the Bankruptcy Code, Court concedes "the legitimate state interest in avoiding such intrusions is not lessened simply because the offender files under Chapter 13 rather than [as in *Kelly* ] Chapter 7," but reaches conclusion opposite from that reached in *Kelly* since "[h]ere ... the statutory language [is not ambiguous]").

In sum, while ambiguities as to what conduct constitutes a violation may lurk in

---

**6.** Nor do we find apposite *Heublein, Inc. v. South Carolina Tax Comm'n,* 409 U.S. 275, 93 S.Ct. 483, 34 L.Ed.2d 472 (1972), or *Penn Dairies, Inc. v. Milk Control Comm'n,* 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943), each of which was cited by the district court. In these cases the Court addressed the validity of state statutes which purportedly conflicted with federal legislation. In each instance, based upon pertinent legislative history, the Court concluded that the

relevant federal statute was limited in scope, and that, therefore, because of the federal statute's limited scope, no federal-state conflict existed. RICO, in contrast, has a broad remedial purpose which is served by its application in the context herein, and, unlike the federal statutes considered in *Heublein* and *Penn Dairies,* RICO contains an explicit legislative directive that it be liberally construed.

the RICO statute, the statute is not ambiguous as to whether its proscriptions extend to a state-regulated public utility. Since a public utility is an "entity capable of holding a legal ... interest in property," 18 U.S.C. § 1961(3), clearly RICO's proscriptions apply. If this be a defect, "it is one 'inherent in the statute as written,' and hence beyond our power to correct." *H.J., Inc. v. Northwestern Bell Tel. Co.,* ─── U.S. ───, 109 S.Ct. 2893, 2905, 106 L.Ed.2d 195 (1989) (quoting *Sedima,* 473 U.S. at 499, 105 S.Ct. at 3286). Thus, we conclude the district court erred in granting judgment n.o.v. to the defendants based upon its conclusion that under the circumstances herein RICO is inapplicable to LILCO.[7]

### C.

■■■ LILCO next contends that the *Burford* abstention doctrine requires dismissal of Suffolk's claim. The *Burford* doctrine, established in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), operates to prevent federal courts from interfering unduly with specialized, ongoing state regulatory schemes. Its application may be warranted "where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Public Serv., Inc. v. Council of City of New Orleans,* ─── U.S. ───, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conservation Dist.*

*v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). As do all abstention doctrines, *Burford* reflects a "complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *See Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 11 n. 9, 107 S.Ct. 1519, 1526 n. 9, 95 L.Ed.2d 1 (1987). LILCO argues that abstention is appropriate in this case because "application of a federal RICO remedy would wreak havoc with the state regulatory process[, and because] [t]he PSC, not a federal court, is in the best position to provide a remedy in the best interests of ratepayers for frauds allegedly committed in PSC rate cases." Upon consideration of the "complex of considerations" that should inform a federal court's decision to abstain, we believe several factors militate against acceptance of the argument urged by LILCO. Combined, we believe these factors compel the conclusion that *Burford* abstention is not appropriate here.

First, since the district judge dismissed without prejudice Suffolk's state law claims before trial, the action which was tried herein involved only federal claims. As the Supreme Court has noted, "the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention." *Colorado River,* 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21 (citing *Burford,* 319 U.S. at 318 n. 5, 63 S.Ct. at 1099 n. 5). The fact that here *only* a federal claim was present raises the level of justification even more.[8] *See Holmes v.*

---

**7.** Congress has often *expressly* excluded public utilities from the ambit of a law of general applicability. *See, e.g.,* 10 U.S.C. § 7430(j) (authority of Secretary of Energy to exercise control over naval petroleum reserves); 28 U.S.C. § 1342 (limiting authority of federal district courts to enjoin "any order affecting rates chargeable by a public utility"); 30 U.S.C. § 185(r) (excluding public utilities "subject to regulation by a State ... regulatory agency" from "[t]he common carrier provisions of this section"); *see also Davies Warehouse,* 321 U.S. 144, 64 S.Ct. 474 (limiting United States Price Administrator from regulating rates charged by state-regulated public warehouse). Congress is free to rewrite RICO to expressly exclude from its scope conduct by state-regulated public utilities; however, in the absence of ambiguous statutory language or contradictory legislative his-

tory, such "rewriting ... is a job for Congress, if it is so inclined, and not for this Court." *H.J., Inc.,* 109 S.Ct. at 2905.

**8.** Indeed, the Ninth Circuit has held that the absence of a state law claim precludes application of the *Burford* doctrine. *United States v. Adair,* 723 F.2d 1394, 1402 n. 5 (9th Cir.) (when "all claims raised in the federal suit have their genesis in federal law ... we find no occasion to apply *Burford* abstention"), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). While we see no need at this time for us to adopt the absolute rule stated in *Adair,* our sister circuit's view does indicate the importance of the "federal law only factor" within the *Burford* analysis's "complex of considerations."

*New York City Housing Auth.*, 398 F.2d 262, 267 (2d Cir.1968); *cf. Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3d Cir. 1988) ("If only state law applies, *Burford* abstention carries more weight than when federal interests require evaluation as well.").

A second militating circumstance is the fact that, after being invited by the district judge to comment on the issues raised herein, the Office of the New York State Attorney General replied that "an award of damages in this case would enhance, rather than conflict with, New York's regulatory scheme." Similarly, the PSC apparently did not believe this case would be disruptive of New York's regulatory policy since, in its own letter to the district judge, it wrote that "the Commission does not intend to file substantive comments or to participate otherwise as a party or intervenor in the proceeding." The Supreme Court has noted that *Burford* "does not require abstention whenever there exists [a complex state administrative process]." *New Orleans Public Serv.*, 109 S.Ct. at 2514. More is needed, namely, a determination that a federal exercise of jurisdiction would be unduly disruptive of the "complex state administrative process." In making this determination, we believe the opinion of the state's Attorney General is entitled to weight, particularly when that opinion is not contradicted by the responsible state agency and the import of the Attorney General's opinion is that the federal court should *not* abstain.

Finally, the unavailability of treble damages and attorneys' fees in an action before the PSC also militates against the application of the *Burford* doctrine. While this factor is not determinative, the unusual remedies of treble damages and attorneys' fees suggest the importance of the federal interest involved, again raising the level of justification needed to abstain.

In view of the foregoing, we conclude that the "complex of considerations" present herein does not justify abstention. Because the obligation of the federal courts to adjudicate claims within their jurisdiction is " 'virtually unflagging,' " *New*

*Orleans Public Serv.*, 109 S.Ct. at 2513 (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988)), resort to *Burford* abstention must not become an automatic response to the presence of an intricate state administrative scheme; proper application of the doctrine requires that a more searching inquiry be made. In this case, other than the *sine qua non* of an intricate state administrative scheme, inquiry reveals no other factor supportive of abstention. A comparison to *Burford* itself proves instructive. In that case, in contrast to the factors noted above, (1) state issues predominated, (2) the Attorney General of Texas argued for abstention, not against it, as New York's Attorney General did here, and (3) identical remedies were available in the state and federal forums. In sum, we believe that to abstain under these circumstances would, contrary to the Supreme Court's repeated direction, make abstention too much the rule and too little the exception. *See New Orleans Public Serv.*, 109 S.Ct. at 2513.

### D.

■ LILCO also contends that the doctrine of primary jurisdiction provides an independent basis for the dismissal of Suffolk's claim. Generally, primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (citing *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940)); *see, e.g., Delta Traffic Serv., Inc. v. Appco Paper & Plastics Corp.*, 893 F.2d 472 (2d Cir.1990) (Interstate Commerce Commission has primary jurisdiction over issues involving the reasonableness of motor carrier rates; district court erred in not referring matter to the Commission).

While Judge Weinstein stated that "the doctrine of primary jurisdiction would apply if the Public Service Commission were a federal agency," Trial Transcript at 6411, "[i]n light of [his] conclusion that RICO [did] not apply to this case, [he did] not decide whether the primary jurisdiction doctrine, by itself, [provided] a sufficient basis for a stay or dismissal of this action." 710 F.Supp. at 1393. Noting, *inter alia,* that the PSC is not a federal agency, we conclude that the doctrine of primary jurisdiction is not applicable herein.

■ We are unaware of any cases in which this Circuit has previously addressed the question of whether a federal court presented with a federal claim can utilize the primary jurisdiction doctrine in favor of a state administrative agency. It is our view that the doctrine ordinarily may not be applied where, as here, the claim is brought under federal law and there are no competing federal forums.[9]

Initially, we note that the main justifications for the rule of primary jurisdiction are the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation. *Western Pac.,* 352 U.S. at 64, 77 S.Ct. at 165; *Great N. Ry. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). The uniformity rationale clearly does not support application of the doctrine in the federal question/state agency context. Indeed, since application of the doctrine in such a context might well result in review by fifty different state agencies with fifty different charters, resort to state agencies is more likely to ensure non-uniformity.

■ The expertise rationale, on the other hand, does seem to be implicated herein.[10] This would seem to present a question (not presented when a federal agency is in-

volved) of which of the two conflicting rationales—uniformity or expertise—is to prevail. However, in light of the theoretical underpinnings of the primary jurisdiction doctrine, we need not address this question. Ultimately, it is not the functional competence of an agency that determines the doctrine's applicability, but rather the authority *Congress* intended that agency to exercise within a particular statutory scheme. *See Burlington N. Inc. v. United States,* 459 U.S. 131, 142, 103 S.Ct. 514, 521, 74 L.Ed.2d 311 (1982) (federal court's decision vacated because allowing court's exercise of jurisdiction would "undermine[ ] the [federal agency's] ability to exercise the primary jurisdiction delegated to it *by Congress"*) (emphasis added); *Western Pac.,* 352 U.S. at 64, 77 S.Ct. at 165 (" 'agencies created *by Congress* for regulating the subject matter should not be passed over' ") (emphasis added) (quoting *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952)). In the federal question/federal agency context, the creation of an agency and the grant to it of certain adjudicative authority may evince a congressional intent to limit the judiciary's jurisdiction. The creation of the PSC by New York State, however, cannot be said to shed any light on any determinative issue relating to congressional intent, and, therefore, we have no basis for declining to exercise the jurisdiction herein authorized us by Congress. *See New Orleans Public Serv.,* 109 S.Ct. at 2513 ("Congress ... defines the scope of federal jurisdiction within the constitutionally permissible bounds"); *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

We recognize, of course, that in utilizing the *Burford* abstention doctrine, federal

---

**9.** We are aware that a narrow exception to the general rule may exist. If a state agency operates pursuant to a federal legislative scheme, for the purposes of the primary jurisdiction doctrine, the state agency may be entitled to the same treatment to which a federal agency is entitled. *Cf. Huron Valley Hosp., Inc. v. City of Pontiac,* 666 F.2d 1029 (6th Cir.1981).

**10.** In light of our conclusion that the primary jurisdiction doctrine does not apply in the federal law/state agency context herein, we need not decide the precise issues which, if found to be within the PSC's field of expertise, would properly be referable to the PSC were the doctrine determined to be applicable.

courts routinely take cognizance of state administrative schemes. In such cases, examination of the relevant state administrative scheme is necessary to determine the existence and extent of federal-state conflict, which conflict provides the primary rationale for the application of the *Burford* doctrine. *See New Orleans Public Serv.,* 109 S.Ct. at 2514 (*"Burford* is concerned with protecting complex state administrative processes from undue federal interference...."). However, federal-state conflict as such is not the pivot upon which the application of the primary jurisdiction doctrine turns, as is demonstrated by the many cases applying the doctrine in a federal court/federal agency context. *See, e.g., Western Pac.,* 352 U.S. 59, 77 S.Ct. 161; *Far East Conference,* 342 U.S. 570, 72 S.Ct. 492; *Delta Traffic,* 893 F.2d 472. In determining when the primary jurisdiction doctrine is applicable, the existence and extent of a court-agency conflict is important, but this is so because it may evidence a congressional intent to limit the scope of the courts' jurisdiction. Since the independent act of a state legislature in creating a particular administrative body, such as the PSC, can shed no light on *Congress'* intent to limit the jurisdiction of the federal courts, we find no occasion to apply the doctrine in this context.

## II.

■■■ We now consider the LILCO defendants' contention that, apart from the district court's ruling on the RICO issue, the dismissal of Suffolk's claims may be affirmed on the alternative ground that the defendants were entitled to judgment n.o.v. based on the insufficiency of Suffolk's evidence. Judgment n.o.v. may be granted only when the movant's evidence is so overwhelming that a reasonable jury could only have reached the opposite result, *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986), or " 'such a complete absence of evidence support[s] the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' " *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 132 (2d Cir.1986) (quoting *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89

(2d Cir.1983)). A less stringent standard would risk impermissibly substituting our view of the evidence for that of the jury.

If, however, after viewing all the evidence most favorably to plaintiff, we cannot say that the jury could reasonably have returned the verdict in his favor, our duty is to reverse.... The jury's role as the finder of fact does not entitle it to return a verdict based on only confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial.

*Michelman v. Clark–Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *see Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959–60 (2d Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). Applying this standard, we conclude that the LILCO defendants are entitled to judgment n.o.v. based upon the insufficiency of Suffolk's evidence.

■■■ The RICO statute states that those persons injured "by reason of" a RICO violation may maintain a civil RICO claim. 18 U.S.C. § 1964(c). "The phrase 'by reason of' requires that there be a causal connection between the prohibited conduct and plaintiff's injury." *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 636 (2d Cir.1989); *see also Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285 (plaintiff "can only recover to the extent that[ ] he has been injured in his business or property by the conduct constituting the violation"); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) ("RICO pattern or acts must *proximately* cause plaintiff's injury."). In the context of this case, which involves RICO mail fraud claims, this means that it was necessary for Suffolk to demonstrate at trial that LILCO's misrepresentations to the PSC were relied upon by the PSC, *see Brandenburg v. Seidel,* 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); *Shaw v. Rolex Watch U.S.A., Inc.,* 726 F.Supp. 969, 972 (S.D.N.Y.1989), and that such misrepresentations caused LILCO's rate increases to be granted. We believe the trial evidence, in the permanent phase

of the 1977–78 Rate Case and the permanent phase of the 1983–84 Rate Case is insufficient to demonstrate the required causal connection between Suffolk's alleged injury and the LILCO defendants' conduct. We also believe that, because the fraud alleged in the temporary phase of the 1977–78 Rate Case was corrected in the permanent phase, no damages reasonably can be assessed against LILCO for its conduct during the temporary phase.

### A.

In the 1977–78 Rate Case, Suffolk alleged that Wilfred Uhl, who was then a LILCO Vice–President, in March and May 1977 testified that Shoreham would be in commercial operation by May 1979, when in fact he knew that this projection was unrealistic. A number of documents support Suffolk's allegation. For example, the minutes of a March 22, 1977 meeting between various LILCO executives, including Uhl, and representatives of Stone & Webster, Shoreham's architect-engineer, note that Stone & Webster predicted at that meeting a construction delay of fifteen months. Uhl made no mention of this estimate in his testimony before the PSC the following day.[11] Additionally, sometime before his May 2, 1977 testimony, Uhl received and read a report, dated April 1977, prepared by five LILCO executives (the "Burke–Museler Report") predicting a delay of nine to fifteen months. *This estimate also went unmentioned in Uhl's testimony.* In support of its contention that Uhl purposely misled the PSC, Suffolk also points to a confidential memorandum prepared by him, dated July 5, 1977. The Uhl memorandum states "Stone & Webster ... believe there is a reasonable prospect for fuel load in December 1979 (a one year delay from the present schedule). *I agree that December 1979 fuel load (May 1980 Commercial Service) is a realistic schedule....*"

The LILCO defendants assert that, even assuming Uhl purposely misrepresented Shoreham's expected completion date in his

testimony before the PSC, judgment n.o.v. in their favor is still proper because the evidence was insufficient for the jury to reasonably conclude that the PSC relied on Uhl's representations in deciding to grant LILCO rate increases. Based upon our review of the pertinent evidence, we agree.

Regarding the permanent phase of the 1977–78 Rate Case, we believe the documentary evidence adduced by LILCO in support of its motion for judgment n.o.v. is conclusive of the issue as to whether the PSC relied on Uhl's representation that the projected commercial operation date was May 1979. This evidence demonstrates that the PSC, at the time it voted to grant LILCO a permanent rate increase on January 9, 1978, knew that the plant was not scheduled to be in commercial operation until 1980. "[W]here the recipient knows the true facts that are misrepresented ..., he cannot be found to rely on it." 2 F. Harper, F. James & O. Gray, The Law of Torts § 7.13, at 465 (2d ed. 1986); *see Grantham and Mann, Inc. v. American Safety Prods., Inc.,* 831 F.2d 596, 606 (6th Cir.1987) (affirming directed verdict in RICO case where "pleadings and proof at trial demonstrate that [plaintiff] was in no way deceived by [false] mailings and in no way relied on those letters to its detriment"). Here, it is undisputed that, *inter alia,* in October 1977 LILCO submitted a petition to the PSC which stated that "the scheduled date for operation of [Shoreham] is now the last half of 1980." Judge Weinstein ruled, without objection by Suffolk, that "[a]nything in the petition would be deemed noticed to the Public Service Commission by the jury." Further, LILCO's quarterly report to the PSC for the quarter ending September 30, 1977, stated that Shoreham was expected to "commence commercial operation in the fall of 1980 rather than in 1979." Suffolk cannot plausibly contest the effectiveness of these notices in informing the PSC that the May 1979 projection had been abandoned; indeed, Suffolk's expert witness, Gregory Palast, conceded that "at the beginning of

---

**11.** Uhl did acknowledge, however, that LILCO was "running four months behind where we should be in working for [the] May 1979 date"

and that there was "but a very small probability that [LILCO could] make up the full four months."

October [1977] ... the Commission was told ... that the Shoreham plant would be delayed by over a year.... [T]he Commission was notified of that." Even more significantly, in PSC Opinion No. 78–1, issued on January 9, 1978 (reh'g denied April 17, 1978), the PSC acknowledged that Shoreham was not expected to enter service until 1980: "In this Opinion, our calculation of adjusted operating income assumes that the three years, 1977–1979, beginning in the year the change in accounting was made and ending the year *before* the Shoreham plant is planned to be in service, would be a representative period" (emphasis added). *See also* PSC Opinion No. 85–23 (recognizing that "[i]n October 1977, ... the commercial operation date [for Shoreham] was extended to September 1980"). In light of this express acknowledgment, it is inconceivable that the PSC, on January 9, 1978, when it issued Opinion No. 78–1, did not know that the scheduled commercial operation date for Shoreham was no longer May 1979, but instead had slipped to 1980. If the PSC necessarily knew Shoreham would not be in service until 1980, it cannot be found to have relied upon Uhl's representation that Shoreham would be in service during 1979. Accordingly, we conclude judgment n.o.v. is proper in the 1977–78 Permanent Rate Case.

Suffolk's contention that LILCO's notice to the PSC does not preclude a "finding that LILCO or Uhl intended to deceive," while accurate, misses the point. The LILCO defendants do not challenge the sufficiency of the evidence regarding LILCO's or Uhl's intent to deceive. Instead, they direct their challenge at the sufficiency of the evidence regarding the PSC's reliance on the LILCO defendants' misrepresentations. This is a different issue altogether, which bears directly on the requirement of showing that Suffolk's injury occurred "by reason of" the misrepresentations of LILCO and Uhl.

While it is true that the PSC's approval of LILCO's temporary rate increase request in the 1977–78 Rate Case predated the PSC's awareness of Shoreham's projected 1980 completion date, the PSC reserved the right to refund the temporary increase if, in the permanent phase, it decided the temporary increase should not have been granted. Specifically, the PSC directed LILCO

> to keep accurate, detailed accounts during the further pendency of this proceeding of all amounts received as the result of the establishment of temporary rates by the Commission ... in order that the Commission may be in a position, upon conclusion of this proceeding, to require it to refund with interest to the persons on whose behalf such amounts were paid, so much of such increased rates as may then be found to have been not justified.

For this reason, the district court properly charged the jury that "there would be no damages" if "any fraud in the temporary phase was corrected in the permanent phase." The fraud alleged in the temporary phase stemmed from the same misrepresentation underlying the fraud alleged in the permanent phase, *i.e.*, that Shoreham was expected to be in commercial operation by May 1979. Because, as we have shown above, the evidence demonstrates that the PSC knew Shoreham would not be in commercial operation until 1980, it also conclusively reveals that this misrepresentation was corrected in the permanent phase. In sum, since "the vote for the final increase [represented] approval of the temporary [increase]," and the PSC gave such approval in Opinion No. 78–1 notwithstanding its awareness of a predicted commercial operation date of 1980, no damages may be assessed for the temporary phase.

B.

We also believe the evidence is insufficient to support the jury's verdict in the 1983–84 Rate Case. In May 1983, LILCO applied for a permanent rate increase. The rate application was premised on a projected commercial operation date of April 1, 1984. In support of LILCO's application, on May 27, 1983, Robert A. Kubinak, Manager of LILCO's Nuclear Operations Support Department, testified that Shoreham was "substantially complete." On June 29, 1983, Uhl, who was then President of

LILCO, testified "that from a construction standpoint," he was confident "that in early August all systems will be [go] for [Shoreham]." The import of completing construction was that such completion presumably would allow LILCO to load fuel in August 1983, and thus enable it to have Shoreham ready for commercial operation as a nuclear power plant by LILCO's projected date of April 1, 1984.

Approximately six weeks after Uhl's June testimony, on August 12, 1983, Shoreham's emergency diesel generators failed during testing. This event, as both Suffolk and LILCO note in their briefs, indefinitely delayed Shoreham's operation. Consequently, LILCO withdrew its pending rate application and, in December 1983, "filed, for a rate year ending September 30, 1985, a new forecast, which assumed Shoreham would not operate in the rate year." PSC Opinion No. 84–22 (Aug. 27, 1984). This new application was premised on LILCO's tenuous financial position. On January 24, 1984, in support of the December 1983 application, Uhl testified before the PSC. In response to a request for "a status report ... as to the current status of the Shoreham unit," Uhl replied: "The Shoreham unit is complete as far as construction is concerned except for the diesel engines which failed last August."

At trial, Suffolk contended that Uhl's testimony was false in that the Shoreham construction was not complete "except for the diesel engines" at the time of Uhl's January 1984 testimony. Suffolk further contended that LILCO knew the testimony was false and that were it not for such testimony, the PSC would not have granted LILCO the rate increase it authorized in the 1983–84 Rate Case.

We recently have stated that "the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation...." *Hecht,* 897 F.2d at 23–24. In our view, as discussed below, the evidence adduced at the trial herein fails to adequately support the conclusion that the testimony of Kubinak and Uhl was a "substantial factor" in the PSC's decision to grant LILCO the rate increase requested herein. Had the decision to grant LILCO's rate application been premised upon a projected commercial operation date of April 1984, it could not reasonably be disputed that the fact misrepresented—the construction status of Shoreham—was a substantial factor in the PSC's rate determination. Obviously, commercial operation was not a viable achievement until the plant was completed. However, the flaw in Suffolk's proof stems from the fact that, as the PSC opinions make clear, the PSC rate increase in the 1983–84 Rate Case was not premised upon the completion of construction and ensuing commercial operation of Shoreham within a particular time frame. Indeed, the PSC rendered its rate decisions in the 1983–84 Rate Case *after* the diesel generators failed, and, thus, it unquestionably knew at the time it made its rate decisions that Shoreham would not be completed in time for commercial operation to commence in April 1984 nor anytime soon thereafter. There is a paucity of evidence suggesting the independent importance of plant completion apart from its relation to Shoreham's beginning commercial operation date. In addition, the evidence overwhelmingly reveals that, at the time the PSC acted on the rate increase sought, LILCO's grave financial condition was of such importance to the PSC that it rendered other concerns insignificant at the time. We believe the pervasive evidence of these essential facts justifies granting judgment n.o.v. in favor of LILCO and Uhl with respect to the 1983–84 Rate Case.

Initially, we review PSC Opinion No. 84–22, dated August 27, 1984, in which the PSC granted LILCO the permanent rate increase that provides the basis for Suffolk's alleged damages in this case. PSC Opinion No. 84–22 constitutes the type of unimpeached and uncontradicted evidence favorable to the movant that can be considered by us in evaluating the merits of a denial of a motion for judgment n.o.v. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 573 (1971). This opinion expressly rejected the idea that the 1983–84 Rate Case was "a Shoreham case, [involving] the allowance of a return on

specific property." It explicitly stated that such was "not the subject matter here. This case concerns the financial stability of LILCO and its need for cash flow relief...." "The company has shown that, without relief, it will likely default on the $90 million bond redemption due September 1, 1984 and that its projected cash deficit for that month is $43.3 million." "[R]ecogniz[ing] the urgency of [these] needs," the PSC concluded "that the revenues received pursuant to the temporary rates now in effect should be made permanent ... and that LILCO should be allowed additional revenues.... [T]hese results will permit LILCO to overcome the threat of insolvency and engender in the investment community the confidence needed to provide the company the outside financing it needs." The only reference in Opinion No. 84–22 to Shoreham's construction is a recognition that while LILCO's original rate application assumed Shoreham would be in service by 1985, the failure of the diesel generators made the assumption untenable. LILCO's revised application, the opinion pointedly noted, "assumed Shoreham would not operate in the rate year [ending September 30, 1985]."

The PSC's November 15, 1984 order denying rehearing of its ruling in Opinion No. 84–22 notes that such emphasis upon LILCO's "urgent" financial needs was consistent with the PSC Commissioners' statutory responsibilities. In discussing the "reasonable basis" for their decision in 84–22, the Commissioners discussed the impor-

tance of maintaining a utility's "financial integrity." They observed that "the financial consequences to the utility arising from inadequate rate relief could have been more drastic (i.e., bankruptcy) than is usually the case." They rejected the contention that they "erred in approving rates to avoid bankruptcy" (internal quotation marks omitted). Conspicuous by its absence in the PSC's Discussion of its rate determination in Opinion No. 84–22 is any mention of Shoreham. See also Kessel v. Public Serv. Comm'n, 123 A.D.2d 203, 205, 511 N.Y.S.2d 441, 443 (3d Dep't 1987) (in 1983–84 Rate Case, PSC "exercised its broad discretion in attempting to preserve LILCO's financial integrity in order to continue reliable service while at the same time maintaining affordable rates for consumers.").

The various references to the record evidence cited by Suffolk do not at all suggest that the 1983–84 Rate Case really was "a Shoreham case" in which the precise construction status of Shoreham was a substantial factor. Nevertheless, since Suffolk only need meet a minimal evidentiary burden to withstand LILCO's motion for judgment n.o.v., we must address Suffolk's contrary claim.

To support its view that "Shoreham's completion date was of vital importance in the 1983–84 Rate Case," Suffolk primarily relies upon the testimony of two former members of the seven member PSC, Commissioners Mead and Pooler.[12] Specifically, Suffolk cites the following exchanges:

**12.** Suffolk also relies upon the following testimony by former PSC Commissioner Karen Burstein:

> Suffolk's attorney (to Burstein): Was [it] important to you in [the 1983–84] rate case as an intervenor to know the plant was finished in August?
> Burstein: Again, absolutely. It had consequences for how much we would challenge of the application.

Initially, we note that Burstein, who did not testify as an expert witness, was not a PSC Commissioner during the pendency of the 1983–84 Rate Case. She served from June 1981 to July 1983 as Executive Director of the New York State Consumer Protection Board, after which she became head of the New York State Civil Service Commission. The subject question was directed at her understanding of these

events during the period when she was affiliated with the Consumer Protection Board, since only the Consumer Protection Board, and not the Civil Service Commission, intervened in the PSC proceedings, see N.Y.Exec.Law § 553(2) (McKinney 1982) ("[t]he executive director [of the consumer protection board] shall have the power and duty to ... intervene in ... any proceedings before the public service commission...."). As noted, her affiliation with the Consumer Protection Board ended in July 1983. Significantly, therefore, Burstein not only was not a member of the PSC during the 1983–84 Rate Case, but she did not even act as an intervenor after July 1983. Thus, her answer refers to a time frame preceding the failure of the diesels in August 1983, and refers to a LILCO application predicated upon a predicted commercial operation date of April 1984, which

*Suffolk's attorney (to Mead):* Would it have been important to the Commission and to you as a sitting commissioner to know that ... Mr. [Uhl] testified on January 1984, had deliberately falsified ... his testimony of the status of the plant at that time?

....

*Commissioner Mead:* Yes, that would be important.

....

*Suffolk's attorney:* If you had discovered ... that Mr. [Uhl] had deliberately misrepresented to you, to the Commission the status of the plant at that time ..., would that have affected your vote as a commissioner?

....

*Commissioner Mead:* ... I think I would have been hard pressed to probably vote for this fairly large increase as I recall it....

\*　　\*　　\*　　\*　　\*　　\*

*Suffolk's attorney (to Pooler):* [A]s a commissioner on the PSC, did the cost and completion date for Shoreham matter to you?

....

*Commissioner Pooler:* Of course they matter.

....

*Suffolk's attorney:* Would it have been important to you as a commissioner to have access and copies of the fuel load requirement report which showed that the plant was not completed in January of 1984, excluding the diesel generator situation?

*Commissioner Pooler:* It would have been important.

\*　　\*　　\*　　\*　　\*　　\*

Addressing these exchanges, we note first with reference to Commissioner Mead's testimony that responses to questions concerning knowledge by the PSC of deliberate falsification by LILCO are in no definitive manner probative of whether the PSC would have declined to grant LILCO its requested rate increase in the absence of the defendants' misrepresentations. As Suffolk itself recognizes in its Reply Brief, "the issue presented is not what the PSC would have done had it discovered that LILCO was lying during the course of a particular proceeding[;] [r]ather, the relevant question is whether there was evidence supporting the jury's finding that Suffolk was injured 'by reason of' fraudulent conduct." Commissioner Mead's testimony addresses the issue of what the PSC would have done had it discovered that LILCO was lying. It does not address the issue of whether the false information provided by LILCO to the PSC itself proximately caused Suffolk's damages.[13] Thus, it does not satisfy Suffolk's evidentiary burden, which is, we reiterate, to show that the PSC would have denied the rate increases requested by LILCO if it had known the truth about Shoreham's construction status.

The testimony of Commissioner Pooler, "[o]f course [the cost and completion date for Shoreham] matter[ed]" and "[i]t would have been important [to know Shoreham's construction was not completed in January 1984]," does appear to address the causation issue. In determining whether this

---

application was withdrawn after the diesel engines failed. The evidence overwhelmingly indicates that the failure of the diesel generators in August 1983 changed the basis for LILCO's rate application and changed the expectations of all parties regarding Shoreham's probable commercial operation date. Quite apart from the other reasons discussed above, since Burstein's testimony is specifically directed at events *preceding* the failure of the diesels, we do not believe that *any* reasonable inferences can be drawn from such testimony regarding the relation between the PSC's rate determinations and Shoreham's construction status in the very different circumstances that existed after the die-

sels failed in August 1983 and LILCO's initial rate application was withdrawn.

13. As the district judge charged the jury:

[Y]ou may not find for plaintiff unless the plaintiff meets the burden of proving that ... the plaintiff paid higher electric rates because the defendants made material misrepresentations to the PSC. To prove causation the plaintiff must meet its burden that the plaintiff would not have paid the higher rates at issue in this case if the defendants had not made the misrepresentations alleged by the plaintiff.

testimonial evidence is sufficient to withstand LILCO's motion for judgment n.o.v., Suffolk "must be given the benefit of all reasonable inferences which may be drawn in [its] favor...." *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970). What inferences are reasonable, however, "is dependent on the unique circumstances of each particular case." Cooper, *Directions for Directed Verdicts: A Compass for Federal Courts,* 55 Minn.L.Rev. 903, 956 (1971).

An examination of the evidence herein reveals an awareness at the PSC of a pervasive specter of LILCO facing imminent financial collapse. Commissioner Pooler's testimony illustrates the perceived depth of LILCO's financial instability:

> I came back from vacation to cast [my] vote [in the 1983–84 Rate Case] to make it unanimous because I was advised by people at the Commission that it was so important, that the late rating of the company, that the potential bankruptcy, that the danger of the company was so imm[i]nent that it wasn't just enough to have it six [votes for the rate increase with] one abstinence, but it had to be seven to nothing in order to send the strongest possible message to Wall Street that the Commission was not going to let LILCO go under.

Other testimony by Commissioner Pooler indicates, consistent with the language of PSC Opinion No. 84–22, that this concern about LILCO's precarious financial position was such that the status of Shoreham's construction schedule, for the purposes of the voting in the 1983–84 Rate Case, was not a matter of significance to the Commission:

> *LILCO's attorney (to Pooler):* Now, do you know that the 1983, '84 rate case explicitly excluded Shoreham from consideration?
>
> *Commissioner Pooler:* Yes.
>
> *LILCO's attorney:* Do you agree that the rate increase that was granted on August 27, 1984, [in Opinion No. 84–22,] in connection with the '83, '84 rate case was not based on any ... belief that Shoreham would be ready for operation soon?

> *Commissioner Pooler:* It was based on a belief that Shoreham would not be ready soon, yes.

The testimony of Commissioner Mead echoed Commissioner Pooler's view on this point:

> *LILCO's attorney (to Mead):* You and I both agree ... that the rate increase that was granted on August 27, 1984 in connection with the 83–84 rate case was not based on any belief by the Commission that Shoreham would be ready for operation soon, correct?
>
> *Commissioner Mead:* Correct. I have not denied that.
>
> . . . .
>
> *LILCO's attorney:* Now in particular do you agree that as the Commission stated in adopting LILCO's contention on this point the rate increase in the 83–84 proceeding was not determined on the basis of any assumption concerning the operation or abandonment of Shoreham?
>
> *Commissioner Mead:* Well, that is correct.
>
> . . . .
>
> *LILCO's attorney:* [T]he 83–84 case [was not] dependent on when Shoreham would operate[,] right?
>
> *Commissioner Mead:* We didn't know when it was going to operate. The diesel blew up.

On direct examination, Commissioner Pooler also testified as to the reason she voted for the rate increase in the 1983–84 Rate Case:

> [A]t the time [we believed] that the alternative to th[e] rate increase was bankruptcy of the company and since we—at least I felt that my responsibilities were not just to the consumers, but to the investors and to the area.
>
> I mean we didn't know what would happen [if] LILCO went bankrupt. None had gone bankrupt since the Depression. So ... we [v]oted for this.
>
> . . . . Maybe with a reorganization and a judge in a bankruptcy court the company could have continued[;] maybe the power wouldn't have gone off. But since we weren't sure enough that it wouldn't

be a catastrophe, ... I voted for th[e] rate increase.

Since we are presented with an appeal of a denial of LILCO's motion for judgment n.o.v. and we must give Suffolk the benefit of all reasonable inferences, we accept as fully credible Commissioner Pooler's earlier cited statements indicating that the cost and completion date of Shoreham mattered to the PSC. However, in determining what may reasonably be inferred from such testimony, Suffolk "is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Lewis v. Nelson*, 277 F.2d 207, 210 (8th Cir.1960). Suffolk asks the court to accept Commissioner Pooler's statements as sufficient to establish that the Commission would have voted against the rate increase and risked LILCO's bankruptcy (and possible "catastrophe") had it known that Shoreham could not have operated within LILCO's purported completion schedule even if the diesels had not failed. In light of the clear and undisputed evidence that the PSC's vote in Opinion No. 84–22 was motivated by fears related to the specter of LILCO's bankruptcy and not upon the belief that Shoreham would soon be operational, and the undisputed and widely known fact that, because of the diesel failure, Shoreham could not have been operated even if the plant was otherwise complete, we believe the inference Suffolk urges upon us to be an unreasonable one.

This conclusion appears particularly apt when one considers the statements of Commissioner Pooler in the context of her further testimony. For example, immediately after replying that "[i]t would have been important [to know that Shoreham was not complete in January 1984]," Commissioner Pooler was asked whether she would have voted differently if she had known "that Mr. Uhl had deliberately misrepresented to the Commission the status of the plant ... ?" Commissioner Pooler replied:

I don't know. I think I probably would have, although the issue of impending bankruptcy was always there. But it would of course [have] cast doubt on the credibility of the case and I may have—I may have voted differently. It's hard to know after all these years later.

The extremely vague, uncertain, and equivocal nature of this answer is apparent. The burden was on Suffolk to demonstrate that knowledge of Shoreham's incomplete construction status *would have been important enough to cause the PSC to have voted differently in the 1983–84 Rate Case.* Commissioner Pooler's uncertainty as reflected in her answer fails to provide even a minimally firm basis for a fact-finder to draw the required conclusion. Also, as stated previously, this case does not concern what action the Commissioners would have taken if they had known the defendants had lied; instead, it concerns what action the Commission would have taken but for the misrepresentations. The two inquiries are separate and distinct, and are by no means certain to yield identical answers.[14] Indeed, the only reason given by Commissioner Pooler for why she may have voted differently had she known of deliberate misrepresentations—"it would [have] cast doubt on the credibility of the case"—relates only to what action she might have taken if she had known the

---

**14.** Commissioner Burstein, for example, stated that the PSC would not have approved rate increases if it thought LILCO had deliberately lied; however, she also stated that she did not know whether the PSC would have approved such increases if LILCO had testified to a later completion date for Shoreham. When asked about the alleged discrepancy in her two answers, Commissioner Burstein replied:

I see there being two questions. The question that you posed in the deposition is not the question I answered earlier today in testimony. The question you posed at the deposition was if in fact some people come sworn to

a particular date, it was later than the one sworn to in that case, would the Commission have considered including equipment rate base. The answer is I don't know. They might have and might not have.

The question I answered earlier today, what would the Commission have done if it were known the witness sworn to tell the truth was in fact lying. I answered we would throw out the testimony of the Long Island Lighting Company as to that point and maybe to everything else.

Trial Transcript at 2279–80.

defendants had lied, and not to what action she might have taken had she been told the true state of affairs instead of the misrepresentations. In sum, in light of Commissioner Pooler's equivocal response as to how she might have voted had she known of LILCO's deliberate misrepresentations, and in light of all the record evidence concerning the fear of economic catastrophe and the diesel generator failure, for a jury to imbue the status of Shoreham's construction schedule with determinative significance merely because of Commissioner Pooler's statement that she considered it in some way "important" required a speculative leap which we believe went beyond the range of permissible inference.

Similarly, after stating "[o]f course [the cost and completion date for Shoreham] matter[ed]," Commissioner Pooler was asked why "they matter[ed]." She replied:

> . . . .
>
> [T]his company was always asking for money because of Shoreham. [W]e were worried about them having money in the till to pay their employees, to pay for fuel, to pay for gasoline for the trucks, to pay for the repair people. We were worried about them having enough cash.

Such concerns, which reinforce the evidence showing that the PSC's concern was related to the prospect of bankruptcy discussed in PSC Opinion No. 84–22, would have been present regardless of whether or not Shoreham's non-diesel systems were completed on schedule.

Thus, an examination of the full statements surrounding the testimony cited reveals the insignificance of the inferences that may be drawn from Commissioner Pooler's testimony, and leads us to the conclusion that the grant of judgment n.o.v. in favor of the defendants is justified.

We also reject as lacking probativeness the general statement of Commissioner Mead that "[t]he 83–84 case had everything to do with Shoreham." Obviously, if Shoreham had never been built LILCO would not have faced bankruptcy, and it therefore would not have needed the rate increase approved by the PSC in Opinion No. 84–22. However, it is not enough to suggest or speculate that in retrospect Shoreham should never have been built; as Judge Weinstein repeatedly instructed the jury, this case does not concern the wisdom of building Shoreham. Whatever the cause of LILCO's dire financial plight, the evidence indicates overwhelmingly that it was LILCO's uncertain financial status that motivated the PSC to grant LILCO its requested rate increase in the 1983–84 Rate Case. Indeed, when Commissioner Mead moved beyond generalities and specifically explained why "[t]he 83–84 case had everything to do with Shoreham," her testimony actually supports the position LILCO urges that the 1983–84 rate hike was based not on assumptions regarding the status of Shoreham, but rather on concerns about LILCO's dire financial straits, e.g., "Shoreham may not be mentioned [in Opinion No. 84–22], but the whole point is that the company came in requesting a huge amount of rate hikes because the construction of Shoreham had placed the company in a very serious and delicate financial situation." As this statement indicates, taken in its entirety, Commissioner Mead's testimony quite clearly reveals that LILCO is correct in asserting that the rate increases were premised upon the PSC's undisputed concern about LILCO's financial condition. *See* Trial Transcript at 2588–93 (testimony of Commissioner Mead).

Finally, we address Suffolk's contention that in addition to the LILCO defendants' misrepresentation of Shoreham's construction status, the defendants' concealment of possible defects in Shoreham's diesel generators also provided a sufficient basis for the jury's verdict in the 1983–84 Rate Case. Assuming *arguendo* that the LILCO defendants' knowledge of possible defects was at issue in the 1983–84 Rate Case,[15] it is

---

15. The LILCO defendants contend that their knowledge of defects in Shoreham's diesel generators was at issue only in the Shoreham Prudence Proceeding. To support this contention, the defendants point to Judge Weinstein's charge, which summarized Suffolk's allegations of fraud in the 1983–84 Rate Case and the Shoreham Prudence Proceeding as follows:

clear that, for the reasons explained hereinbelow, the withholding of such knowledge could not reasonably be considered a substantial factor in the PSC's grant of the rate increase in Opinion No. 84–22.

Much of the evidence to which Suffolk directs our attention consists of testimony as to what the PSC would have done had it known that the LILCO defendants concealed knowledge of potential problems with the diesel generators that failed during testing. Allusions to this evidence are misdirected; the issue is what the PSC might reasonably have done had it possessed the information allegedly concealed. The concealment of such information might reasonably be considered to have caused Suffolk's injury if the decision to grant the rate increase was in some degree premised on achievement of a particular projected commercial operation date, the feasibility of which would be affected by concealed problems with the diesel generators. Here, however, we are presented with a rate proceeding in which the decision to grant the rate increase was decidedly *not* premised on achievement of a particular commercial operation date. Moreover, it is an understatement to note that the PSC *knew* that the diesels were flawed *when it voted* for the rate increase in 1984. It was common knowledge, as Commissioner Mead noted, that the diesels "blew up" during their August 1983 testing.

In conclusion, after viewing all the evidence most favorably to Suffolk, we cannot say that the jury could reasonably have returned a verdict in its favor; we believe

the evidence is insufficient to support the jury's verdict in both the 1977–78 Rate Case and the 1983–84 Rate Case.

## C.

The final episode in which the jury found that fraud was committed was the Shoreham Prudence Proceeding.[16] Suffolk claimed no damages resulting from the Prudence Proceeding; evidence relating to it was offered by Suffolk at trial only to show LILCO's *pattern* of deceit. Since no damages were claimed, and damages are an essential element of the civil RICO cause of action, 18 U.S.C. § 1964(c), it is unnecessary to examine this episode at length. The relevance of the Prudence Proceeding as far as satisfaction of RICO's *pattern* requirement is concerned may be assumed. However, because of the absence of proof of damages, the jury's findings regarding the Prudence Proceeding are necessarily inadequate to support a finding of RICO liability *by themselves.* This absence of proof of damages assumes fatal significance in light of our determination that the 1977–78 and 1983–84 Rate Cases failed.

To summarize Part II, since the evidence is insufficient as to the only episodes in which injury was alleged and fraud was found—the 1977–78 and 1983–84 Rate Cases—and no injury was alleged or found in the Prudence Proceeding episode, Suffolk's RICO claims must fail.

---

Six. The 1983–84 Rate Case.
The plaintiff alleges that Robert Kubinak and Wilfred Uhl in prefiled and oral testimony in May and June 1983, respectively, and Wilfred Uhl in January 1984, falsely stated that Shoreham was complete except for the diesel generators. . . .
. . . .
Seven. The Prudence Case.
The plaintiff alleges that William Museler and others by prefiled testimony and other testimony in May and October 1984 falsely stated that LILCO had no indication of substantial crankshaft problems before the diesel crankshaft failure and that all problems had been remedied.
The absence of any mention of deceit involving the diesel generators in connection with the

1983–84 Rate Case in the court's charge supports LILCO's contention. Similarly supportive is the fact that at the charging conference Suffolk did not object to the district judge's proposed charge on this point, although it did make several minute suggestions regarding other points, *e.g.,* "you have Kubinak and Uhl [in] prefiled and oral testimony, May, June, '83. Could you say 'respectively?'" Suffolk does not directly address either of these matters in its briefs.

**16.** The Prudence Proceeding was ordered established by the PSC on May 21, 1979 and concluded with the issuance of a written opinion on December 16, 1985. The purpose of the proceeding was to determine whether the costs of the Shoreham facility were prudently incurred.

## III.

The settlement agreement that was reached between LILCO's attorneys and class counsel after LILCO's motion for judgment n.o.v. in the LILCO–Suffolk litigation was granted is reprinted in full at 710 F.Supp. 1452–66. The district judge summarized the settlement as follows:

> The settlement consists of five main elements: 1) a schedule of payments [totalling $390 million] to the class over an eleven year period, with limited power of the court to defer or accelerate payments upon application by a party; 2) a fund of up to ten million dollars for legal and related costs; 3) organization of a Citizens Advisory Panel to assist the class and LILCO over the next five years, which is interpreted by the court to permit extension until all payments are made (with availability of portions of the $10 million legal fee fund for aid of the panel as permitted by the court); 4) releases which give up class members' rights to sue on the present RICO claims in state or federal courts, which, as interpreted by the court, permit any member of the class to complain to the New York Public Service Commission (PSC); and 5) provisions ensuring that the payments to the class will not be recovered by LILCO through rate increases.

710 F.Supp. at 1433.

On appeal, objections to the settlement, as approved by the district court, are primarily of three types. First, the County of Nassau ("Nassau") contends that the district court improperly excluded it from active participation in the negotiations which led to the settlement. Second, Nassau and others assert that, under the circumstances, the settlement is unfair, unreasonable, and inadequate. Third, LILCO, although, in general, it urges affirmance of the district court's approval of the settlement agreement, claims that the court misinterpreted certain parts of the agreement and asks that we correct these errors. After reviewing the relevant events preceding the settlement, we will consider each of these contentions, as well as various contentions related to the district court's decisions concerning the parties' applications for attorneys' fees.

As already discussed, this action began on March 3, 1987, when Suffolk, five individual ratepayers, and Custom Extruders, Inc., a business ratepayer, commenced a class action suit against the LILCO defendants. On September 6, 1988, the district court denied Suffolk's class certification motion on the ground that Suffolk could not "serve as a proper class representative ... because its supervision of th[e] lawsuit may be driven by its other dealings with LILCO." 710 F.Supp. at 1406. Additionally, the court held that none of the other plaintiffs could serve as class representatives because they were represented by Suffolk's attorneys and Suffolk was paying their legal fees: "Their counsel might well have a conflict of interest between the putative class and the entity paying legal fees—Suffolk County." *Id.*

The five individual ratepayers then retained Judith P. Vladeck, Esq., ("class counsel") to represent them as individuals and potential class representatives. By Order To Show Cause, dated September 15, 1988, Vladeck moved to be substituted as counsel for the individual ratepayers and sought leave to reargue their motion for class certification. Four days later, the district court granted the motion for substitution of counsel, but declined at that time to reconsider the class certification motion. Additionally, "because trial was scheduled to begin a week later and new counsel would have had insufficient time to prepare," 710 F.Supp. at 1411, the district court severed the trial of Suffolk's RICO claims from the trial of the RICO claims of the other individual plaintiffs. On October 3, 1988, the LILCO–Suffolk trial commenced. On December 1, 1988, the individual plaintiffs moved to amend their complaint to name three additional plaintiffs, Robert Hoffman, Susan Chase, and Yolanda Owens, and renewed their motion for designation as class representatives. Four days later, the jury in Suffolk's RICO trial returned its verdict partially in favor of Suffolk.

Shortly after the verdict, LILCO's counsel and Vladeck, aided by a court-appointed mediator, Kenneth R. Feinberg, Esq., began exploratory discussions looking toward possible settlement of the claims of the proposed class action. At the same time, similar discussions were being conducted between LILCO and Suffolk. Meanwhile, various parties sought the district court's permission to intervene in the putative class action. Custom Extruders, Inc., joined by several other small business ratepayers who designated themselves collectively the "Business Ratepayers" moved to intervene on December 21, 1988. The Business Ratepayers also sought designation as class representatives. The next day, Nassau made a similar application. On February 2, 1989, the district judge heard argument on these and numerous other motions, including motions to intervene by various parties who have not appealed herein, *e.g.,* Grumman Corporation, the City of New York, and the Shoreham–Wading River School District.

Following argument on February 2, 1989, the court reserved decision on all of these motions. Thereafter, the court-appointed mediator supervised additional settlement discussions between LILCO's counsel, Vladeck, Suffolk's counsel, and counsel for the *qui tam* plaintiffs, *see* 710 F.Supp. at 1483, the latter participating by virtue of their interest in the related *qui tam* action.

On February 11, 1989, 68 days after the jury returned a verdict partially in favor of Suffolk, the court granted the motion of LILCO and Uhl for judgment n.o.v. Two days later, the court certified a mandatory class of ratepayers pursuant to Fed.R. Civ.P. 23(b)(1)(B), designating the five original ratepayer plaintiffs and the three proposed additional plaintiffs as class representatives, and Vladeck as class counsel. 710 F.Supp. at 1412–13. The court also granted all of the proposed intervenors' motions to intervene; however, the court denied the applications by Nassau and the Business Ratepayers to be designated as class representatives.

The next day, February 14, 1989, LILCO's counsel and class counsel agreed to a tentative settlement. By order dated February 15, 1989, the district court certified three additional individuals as class representatives: James Roth, Myra Berzoff, and Sandra Rosenberg. On February 27, LILCO and class counsel executed a Stipulation of Partial Settlement which set forth the terms of the proposed settlement between the parties. *See* 710 F.Supp. at 1452–66. On February 28, 1989, parallel negotiations between New York State and LILCO produced an agreement regarding the future of Shoreham under which LILCO agreed it would "not operate Shoreham pursuant to any authorization to operate Shoreham that may be or has been granted by the Nuclear Regulatory Commission."

Between March 1 and March 9, 1989, the district court held four fairness hearings at three different locations to determine whether the terms of the settlement reached by LILCO's attorneys and class counsel were fair and reasonable. At the conclusion of the last fairness hearing, pursuant to the district court's earlier invitation, Suffolk filed notice that it was opting out of the class of ratepayers. On March 22, 1989, the district judge approved the settlement. On March 23, 1989, the district judge ruled on various motions for attorneys' fees. Approximately three weeks later, the district court entered final judgment in the class action.

The present appeals followed. On May 25, 1989, the Business Ratepayers group amended its appeal to add as appellants five individual class representative ratepayers who opposed the settlement. To facilitate ease of expression, we shall refer to the combined appeal of the five individual ratepayers and the Business Ratepayers as that of the Ratepayer Appellants.

### A.

 We first address Nassau's contention that it was wrongfully denied meaningful participation in the settlement of the class action. Specifically, Nassau claims that the district court "erred in denying [its] application to be designated as a class representative" and in "refusing to

permit [it] to participate in the settlement negotiations that culminated in the settlement agreement appealed from herein." We assess the district court's purported errors by an abuse of discretion standard.

We recognize the legitimate interests of Nassau in the conduct and resolution of the class action. Those interests are sufficiently substantial so that it appears it would not have been an abuse of discretion for the district court to have granted Nassau a more expansive role in the class action. Nevertheless, it does not appear to us that the district court abused its discretion in denying Nassau a more expansive role. The court's decision was based on the confluence of its belief that "it is vitally important that the action be promptly resolved" and its belief that "there may be further delays while [Nassau] become[s] familiar with the complexities of the class's claims...." 710 F.Supp. at 1422. The record amply supports the correctness of both of these propositions. It is apparent to us that continuation of the controversy could have jeopardized Long Island's economic stability since an atmosphere of uncertainty surrounding the financial viability of a public utility which provides a service as essential as electricity reasonably can be expected to make unattractive both business and personal investment in the area served by the utility. Additionally, Nassau concedes that, as of early February 1989, it had neither retained experts nor allocated litigation funds. In light of this concession, the district judge reasonably concluded that in a case of this complexity, considerable delay could result from allowing Nassau a greater role. The judge did not abuse his discretion in deciding that the risk of further delaying resolution of the class action outweighed Nassau's interest in increased participation and the possible benefits that might accrue to the class from the increased participation Nassau here suggests was its right.

B.

█ We next consider the fairness of the settlement agreement approved by the district court. Both Nassau and the Rate-payer Appellants urge us to set aside the agreement on the grounds that under the circumstances it is not fair, reasonable, or adequate. We disagree with appellants' assessment of the settlement agreement, and we affirm Judge Weinstein's approval.

█ Under Rule 23 of the Federal Rules of Civil Procedure, a class action lawsuit cannot be settled without the approval of the district court. Fed.R.Civ.P. 23(e). In order to protect the interests of the class members, the court must "closely and carefully scrutinize[] the ... settlement proposal to make sure that it [is] fair, adequate and reasonable...." *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir.1982). "[G]reat weight [will] be accorded the views of the trial judge because exposure to the litigants and their strategies makes him uniquely aware of the strengths and weaknesses of the case and the risks of continued litigation. [We] will not overturn a district court's approval of a settlement absent a clear showing of an abuse of discretion." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463 (2d Cir.1982); *see In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir.1986). A proferred settlement that is in large part negotiated prior to certification of the class—as occurred herein—is subject to a higher degree of scrutiny than is usual in assessing a settlement's fairness. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). We are satisfied that the district judge examined the settlement agreement with heightened scrutiny, 710 F.Supp. at 1436; additionally, the judge noted that the presence of the court-appointed mediator during the precertification hearings "helped ensure that the proceedings were free of collusion or undue pressure." *Id.*

█ Commonly, there are nine factors that should be considered in determining the fairness of a proposed settlement:

(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of es-

tablishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.] *Robertson v. National Basketball Ass'n,* 556 F.2d 682, 684 n. 1 (2d Cir.1977) (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)). The district judge expressly considered each of these factors before approving the settlement. 710 F.Supp. at 1436–46. He also "considered a variety of other objections and arguments made at the hearings." *Id.* at 1446–50. In our view, his assessment was careful, methodical, thorough and reasonable.

▇▇▇▇▇▇ Nassau and the Ratepayer Appellants object primarily to the size of the settlement fund, $390 million, which they consider unduly small in light of what they assert was the total possible recovery by the class against LILCO, after trebling under RICO, of approximately $10 billion (including a possible judgment of $4.31 billion on collateral estoppel grounds if Suffolk's verdict were reinstated on appeal).[17] Initially, we note the district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base

recovery figure. 710 F.Supp. at 1439–40; *see City of Detroit,* 495 F.2d at 458–59. More importantly, the judge concluded that there were several "substantial bases for a dismissal of the action," which, "[i]n combination ... substantially reduce[d] the probability of success on appeal," *e.g.,* the scope of RICO, primary jurisdiction, abstention, and "failures of proof requir[ing] setting aside the jury's verdict." 710 F.Supp. at 1442. In assessing the fairness of a settlement, the probable outcome in the event of litigation is properly a factor to be considered by the trial court. *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir.) (quoting *Florida Trailer and Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960)), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). The district judge's assessment regarding the probable outcome was not clearly erroneous so as to render his approval of the settlement an abuse of discretion.

Similarly, the district judge did not commit clear error in accepting as a basis for his approval of the settlement "[t]he PSC's conclusion ... that the total [amount] agreed to be paid by LILCO ... was the largest sum that could be paid without having an adverse impact on ratepayers as well as LILCO," 710 F.Supp. at 1434, either because a larger payment would cause the bankruptcy of LILCO or a "boomerang effect," which would result in higher costs to consumers.[18] In light of such uncertainties regarding "the probabilities of success and

---

**17.** Regarding the maximum judgment attainable by the class, and the minimum judgment if Suffolk's verdict were reinstated on appeal and collateral estoppel applied, the district judge stated:

> In the present action counsel for the proposed class has demonstrated that the potential liability to the class is some $3.4 billion which, when trebled as is required under the RICO statute, would result in a total liability to the class of $10.2 billion. This figure is predicated upon the possibility that the class may demonstrate that all of the allegations in its complaint are true. Since the class was not a party to the recent trial at which plaintiff Suffolk County prevailed on only some of its claims, the class is not bound by findings adverse to Suffolk County in that proceeding....
>
> Should this court's dismissal of Suffolk's claims be reversed and the jury's verdict

against LILCO sustained on appeal, ... an extrapolation from the jury's findings indicates the class's minimum recovery would be $4.31 billion.

710 F.Supp. at 1418.

**18.** The district judge explained the "boomerang effect" as follows:

> [H]igher payments in the RICO settlement would present a serious danger to LILCO by threatening investor confidence in the financial health of the utility. This would lead to higher interest rates.... The higher interest rates would, in turn, under standard PSC practice, be charged back to ratepayers as allowable utility costs. These additional costs would ... more than outweigh any increased level of payments above [the agreed upon figure of $390 million].

710 F.Supp. at 1434.

of collection," 710 F.Supp. at 1439, Judge Weinstein did not abuse his discretion in concluding that, under the circumstances, the settlement amount negotiated herein was fair and reasonable.

Nassau and the Ratepayer Appellants also object to the settlement based on the ground that a majority of the class representatives opposed the settlement. As the district court noted, the record is not entirely clear as to whether a majority of the class representatives actually did oppose the settlement. 710 F.Supp. at 1434. Assuming a majority were opposed, it is clear under the applicable law that even "majority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risks of litigation, determines to be manifestly reasonable." *TBK Partners*, 675 F.2d at 462. This is particularly so when, as the district judge suggested occurred herein, the objecting class representatives may have had interests and goals inimical to the class as a whole. *See* 710 F.Supp. at 1435.

In sum, we conclude appellants have not demonstrated that the district court's approval of the settlement agreement constituted an abuse of discretion.

### C.

LILCO's objections to the settlement agreement are limited to what it characterizes as the district court's unilateral misinterpretations of an unambiguous agreement. The gravamen of LILCO's most substantial objection is that the district court improperly modified the settlement by narrowing the release given by the class members to LILCO. This general objection takes two specific forms, which we consider in turn.

LILCO's first claim is that the district court disregarded the language of the settlement release, set forth in the margin,[19] by ruling that "[o]nly causes of action arguably existing under RICO are waived," 710 F.Supp. at 1448, thereby, according to LILCO, "allow[ing] class members to seek billions of dollars from defendants based on ... claims of breach of implied contract and unjust enrichment...."[20] We do not believe this to be an accurate account of the action taken by the district court, and, therefore, we reject LILCO's contention.

We note that the precise issue we now discuss was presented to the district judge after he issued his opinion approving the settlement agreement. Faced with the contention by counsel for LILCO that language in his opinion could allow members of the class to bring various state law actions, Judge Weinstein replied: "I don't see that. I don't see how that is possible." Later, the district judge stated that to allow such actions "would be terribly unfair." Significantly, class counsel concedes that the district court's interpretation of the scope of the release includes "conduct which comprises the elements of the unjust enrichment and implied contract theories referred to by LILCO."

Moreover, the language in the district court's opinion identified by LILCO— "[o]nly causes of action arguably existing under RICO are waived"—clearly is directed at a different, although related, dispute. The quoted language is found under the subheading *"Members of the Class are Giving Up their Rights to Appear Before*

---

**19.** "Settled Ratepayer Claims" shall mean any and all direct, individual, or class rights, claims, and causes of action, of any nature whatsoever, against the RICO Defendants And Related Parties, whether known or unknown, pleaded or unpleaded, suspected or unsuspected, for compensatory damages, punitive damages, or any other relief, which were or might have been brought from the beginning of time up to the date hereof by or on behalf of any member of the Ratepayer Class, whether brought under state or federal law, based upon or arising from the PSC proceedings complained of or raised, or that might or could have been complained of or raised, in the RICO Action [or] the Amended RICO Complaint....

710 F.Supp. at 1455–56.

**20.** Nassau agrees with LILCO as to the effect of Judge Weinstein's ruling, although disagreeing as to its propriety.

*the Public Service Commission.*" 710 F.Supp. at 1447. The paragraph in which the quoted language is found reads in full:

No release executed pursuant to the settlement agreement waives the right of any member of the class to seek any action by the PSC. Only causes of action arguably existing under RICO are waived. The Public Service Commission is free to give the proceedings before this court any weight it wishes.

710 F.Supp. at 1448.

In context, it is clear that the district judge was contrasting "causes of action," which would include suits based on theories of implied contract and unjust enrichment, with the right to petition. In the district court's view, while "causes of action" were waived, the right to petition was not. Thus, notwithstanding LILCO's contrary suggestion, the district court did not improperly narrow the scope of the settlement release and thus allow suits based on claims such as implied contract and unjust enrichment.

As stated, the court did interpret the settlement to allow members of the class to petition the PSC. 710 F.Supp. at 1448. LILCO's second contention is that, in so doing, the court erred. We disagree.

The settlement agreement expressly authorized the district court to resolve "any dispute ... with respect to the meaning" of the agreement. 710 F.Supp. at 1465 (¶ 32). LILCO contends that, under the plain meaning of the settlement agreement, there was no reasonable dispute for the district court to resolve; the agreement, LILCO asserts, clearly precludes class members from exercising their right to petition the PSC. Our understanding is otherwise. We note first that the agreement contains no specific reference to the right to petition; further, there is no claim that the settlement language prevented class members from utilizing other courses of action which enjoy first amendment protection, such as exercising the right to free speech by publicly advocating positions ad-

verse to LILCO, or exercising the right to peaceably assemble by gathering to protest LILCO's Shoreham-related activities. Judge Weinstein correctly perceived an ambiguity regarding whether the right to petition was to be treated as the rights of free speech and assembly, which were not waived. In resolving this ambiguity, the judge concluded that "[n]o release executed pursuant to the settlement agreement waive[d] the right of any member of the class to seek any action by the PSC." 710 F.Supp. at 1448. This interpretation is not clearly contradicted by the settlement language or any other record evidence. Absent evidence demonstrating clear error, we defer to the ruling of the district court.

### D.

 Finally, we address various objections to the attorneys' fees awarded by the district court. LILCO challenges the decision of the district court to award attorneys' fees to Nassau County, the Business Ratepayers, the *qui tam* plaintiffs, and Grumman Corporation. We affirm these awards as within the discretion of the district court for the reasons correctly stated by the court at 710 F.Supp. 1481–84. Suffolk challenges the decision of the district judge to deny its fee application in its entirety. We agree with this challenge and, hence, we reverse on this claim and remand for a determination of reasonable attorneys' fees to be awarded to Suffolk.

Suffolk premises its claim for attorneys' fees on the equitable fund doctrine. This long-established doctrine is designed "to permit 'fair and just allowances for expenses and counsel fees to [those] parties promoting the litigation.'" *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977) (quoting *Trustees of the Internal Improvement Fund v. Greenough*, 105 U.S. 527, 536, 26 L.Ed. 1157 (1881)). "The theory is that an attorney whose actions have conferred a benefit upon a given group or class of litigants may file a claim for reasonable compensation for his efforts." *Id.*

The key consideration in determining whether an award is justified is the value to the class of the legal work performed for its benefit. In this case, it is clear that the efforts of Suffolk's attorneys substantially benefitted the class. Suffolk's attorneys conducted, to the benefit of the class, virtually all of the pre-trial discovery and motion practice, including motions for class certification. Its counsel were the only plaintiff attorneys who conducted the two-month trial, which resulted in a jury verdict that, through the use of collateral estoppel, could have entitled the class to damages against LILCO of approximately $4.3 billion—an amount sufficient to bankrupt LILCO, 710 F.Supp. at 1418—if the verdict were reinstated on appeal. LILCO has admitted that its decision to enter into a settlement agreement was motivated partly by its fear that the jury verdict might be reinstated and collateral estoppel applied. Additionally, after the trial, Suffolk actively participated in the class settlement negotiations. Moreover, the district court repeatedly commended the quality of Suffolk's legal representation, e.g., "counsel [has] done a superb job [and] tried this case as well as I have ever seen any case tried"; "Suffolk's choice of counsel was superb"; "plaintiff's attorneys ... are doing a very fine job and whatever [they] are being paid [they] are worth every penny." Indeed, the district judge apparently would have awarded Suffolk extensive attorneys' fees had Suffolk not opted out of the class. See 710 F.Supp. at 1449.

In denying Suffolk's application for attorneys' fees, the district judge relied (1) on Suffolk's opposition to the settlement agreement and (2) on the fact that if Suffolk prevailed on its appeal, it would have an independent basis for recoupment of its attorneys' fees, i.e., 18 U.S.C. § 1963(c). Under the circumstances herein, these reasons do not provide a sufficient basis to deny completely Suffolk's fee request. Regarding Suffolk's opposition to the settlement, we note that the Business Ratepayers, Grumman Corporation, and Nassau—

intervenors who, according to Judge Weinstein, made at best "minimal" contributions to the class, 710 F.Supp. at 1481—were awarded attorneys' fees despite their opposition to the settlement. We believe it would be inequitable to deny Suffolk, whose contribution to the class unquestionably was greater than that of all the intervenors combined, all attorneys' fees based upon its own eventual opposition to the settlement.

As for the possibility that Suffolk could recover attorneys' fees based upon RICO's fee-shifting provision, 18 U.S.C. § 1963(c), this possibility is not a persuasive reason for denying fees herein. In our view, fee-shifting statutes are generally not intended to circumscribe the operation of the equitable fund doctrine. Duplicative recovery is to be avoided, of course; equally obviously, if, under a particular combination of facts, the operation of the equitable fund doctrine conflicts with an intended purpose of a relevant fee-shifting statute, the statute must control and the doctrine must be deemed abrogated to the extent necessary to give full effect to the statute. The purpose of fee-shifting statutes, however, is to encourage the prosecution of certain favored actions by private parties. Under the facts herein, we perceive no basis for concluding that giving effect to the equitable fund doctrine would conflict with this purpose. The action intended to be encouraged has already been commenced and prosecuted. Further, one of the purposes of fee-shifting provisions is to encourage plaintiffs "to reject half-measure compromises," see Hensley v. Eckerhart, 461 U.S. 424, 443 n. 2, 103 S.Ct. 1933, 1944 n. 2, 76 L.Ed.2d 40 (1983) (Brennan, J., concurring in part and dissenting in part). Denying a plaintiff in Suffolk's position attorneys' fees based upon its refusal to forsake its RICO appeal disserves this function of the RICO fee-shifting statute, since by increasing the risk of appeal, acceptance of such compromises, not rejection, is encouraged. RICO's fee-shifting statute is not intended to discourage such

appeals. We thus conclude that the equitable fund doctrine applies, with the paramount consideration, we reiterate, being the value to the class of the legal work performed by Suffolk's attorneys.

For the foregoing reasons, we reverse the decision of the district court to deny in its entirety Suffolk's fee application, and remand to the district court for a determination and award of reasonable attorneys' fees.[21]

## CONCLUSION

The judgment of the district court is affirmed except as to the issue of Suffolk's attorneys' fees. On that issue, we reverse and remand for a determination of reasonable attorneys' fees.

With respect to the class action settlement appeal, we have considered all additional arguments presented and find them to be without merit.

In light of our affirmance of the judgment in the LILCO–Suffolk litigation, except as discussed hereinabove we see no need to address the alternative grounds advanced on this appeal by LILCO for affirming the judgment of the district court, or for vacating the judgment and remanding for a new trial.

Affirmed in part, reversed in part, and remanded.

---

**21.** We note that the district court expressly found Suffolk's appeal from the district court's dismissal of its RICO claims would "have no appreciable effect on the settlement.... [Even if successful, the appeal would] have no effect on LILCO's operations or on its ability to pay the rest of the class." 710 F.Supp. at 1449.