**M.R. TAFFET and Robert M. Fierman, on behalf of themselves and all of the persons, corporations, municipalities, and other entities, other than the defendants, who are similarly situated, Plaintiffs–Appellants,**

v.

**The SOUTHERN CO., Southern Company Services, Inc., Alabama Power Company and Arthur Andersen & Co., Defendants–Appellees.**

**Frederick Rodgers CARR, Carr Sales Company, O.E.M. Products, Inc., Timothy Dunn Stokely, Clark Stokely, III and All Others Similarly Situated, Plaintiffs–Appellants,**

v.

**The SOUTHERN COMPANY, Southern Company Services, Inc., Georgia Power Company, and Arthur Andersen & Co., Defendants–Appellees.**

Nos. 90–7088, 90–8452.

United States Court of Appeals,
Eleventh Circuit.

May 6, 1991.

---

Eddie Leitman, Leitman, Siegal, Payne & Campbell, P.C., Andrew P. Campbell, S. Lynne Stephens, Birmingham, Ala., Richard H. Gill, Copeland, Franco, Screws & Gill, P.A., J. Fairley McDonald, III, Montgomery, Ala., John A. Boudet, Baker & Hostetler, Jerry R. Linscott, Orlando, Fla., Andrew M. Scherffius, Andrew M. Scherffius, P.C., A. Timothy Jones, Freeman & Hawkins, Joseph C. Freeman, Jack N. Sibley, Atlanta, Ga., Larry Moffett, Daniel, Coker, Horton and Bell, P.A., Jackson Henderson Ables, III, Jackson, Miss., for M.R. Taffett et al.

M. Roland Nachman, Jr., Balch & Bingham, T.W. Thagard, Jr., Maury D. Smith, John P. Scott, Jr., Montgomery, Ala., for Alabama Power.

James E. Joiner, Troutman, Sanders, Lockerman & Ashmore, Hugh M. Davenport, Atlanta, Ga., for Southern Co.

M. Robert Thornton, King & Spalding, Michael C. Russ, Atlanta, Ga., for Arthur Andersen & Co.

Joe C. Freeman, Jr., Freeman & Hawkins, A. Timothy Jones, Jack N. Sibley, Andrew M. Scherffius, Atlanta, Ga., Nixon, Yow, Waller & Capers, Augusta, Ga., for Frederick Rodgers Carr et al.

Hugh M. Davenport, James E. Joiner, Michael C. Russ, M. Robert Thornton, Atlanta, Ga., for Southern Co. et al.

Before JOHNSON and BIRCH, Circuit Judges, and MERHIGE [*], Senior District Judge.

JOHNSON, Circuit Judge:

In both of these class actions, the plaintiffs appeal the district courts' grant of defendants' motions to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).[1] These appeals require us to address issues of first impression in this Circuit, including the applicability of the clear statement doctrine, *Burford* abstention, the primary jurisdiction doctrine, and the filed rate doctrine to suits by consumers against state-regulated utilities. We reverse the district courts and remand for trials on the merits.

## I. STATEMENT OF THE CASE

### A. *Factual Background*

Alabama Power Company and Georgia Power Company, two subsidiaries of the

---

[*] Honorable Robert R. Merhige, Jr., Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. The cases before us have been consolidated on appeal. The *Taffet* case arises from the Middle District of Alabama, and the *Carr* case arises from the Southern District of Georgia.

Southern Company, are required by the Internal Revenue Service ("IRS") to use an accounting method by which the companies "expense" on their books maintenance spare parts in the year used rather than the year purchased. They are also required to depreciate emergency parts over the life of the equipment rather than to expense them at the time they are initially purchased or put into service. At least as early as 1981, however, the two subsidiaries were allegedly expensing spare parts contrary to the regulations. The effect of the improper accounting was to overstate the utilities' expenses and understate their income.

In 1982, with the help of the accounting firm of Arthur Andersen & Company, both utilities allegedly devised schemes to cover up the wrongful accounting. The two utilities filed requests for a change in accounting method with the IRS for the stated purpose of properly reflecting their spare-part inventories for federal tax purposes. But the two utilities declared to the IRS only a small portion of the amount of spare parts that they had previously improperly expensed. This had the effect of making their inventories appear smaller than they actually were. The utilities then allegedly established dual sets of books. Each utility kept one set of accounts for the IRS. But other records, recorded on personal computers, kept track of the true amount of inventory. As the utilities reduced their inventory of previously expensed parts, deductions from the inventory listings on the secret books would be made, but deductions would not be made from the books kept for the IRS until it appeared advantageous to do so. This dual bookkeeping system allowed the utilities to use up a large amount of the previously improperly expensed parts without the wrongful accounting being discovered.[2] The practice continued until 1988 when an undercover investigator for the IRS unmasked the scheme.

The improper accounting was profitable not only because it resulted in a reduced or deferred tax burden but because it influenced the rates the utilities could charge their customers. In both Alabama and Georgia, the utilities may charge only the rates established by the state Public Service Commission ("PSC"). The PSC sets the rate according to the profitability of the utility. The smaller the utility's income appears, the more likely the PSC is to approve a rate hike.

B. *Procedural History*

Within a few days of each other, two class actions were filed. Customers of Alabama Power initiated a class action against Alabama Power, Southern Company and Arthur Andersen & Company ("the Taffet class"), and customers of Georgia Power initiated a class action against Georgia Power, Southern Company and Arthur Andersen & Company ("the Carr class"). Both suits limited the proposed class to customers who purchased electricity from the approval date of the utility's rate application in 1981 to the date of the court's order.

The Taffet class alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C.A. §§ 1961–1968 and fraud in violation of state law. The Carr class additionally alleged, *inter alia*, violations of the Sherman Anti–Trust Act under 15 U.S.C.A. §§ 1 & 2, the Public Utility Holding Company Act of 1935 under 15 U.S.C.A. § 79 *et seq.*, the Georgia RICO Act under Ga.Code Ann. §§ 16–14–1 *et seq.*, and civil rights violations under 42 U.S.C.A. §§ 1983 & 1985.

The defendants in both cases filed motions to dismiss. The motion was granted against the Taffet class on January 5, 1990, on the grounds that the clear statement doctrine, abstention, the primary jurisdiction doctrine, and the filed rate doctrine barred the complaint. The motion was granted against the Carr class on March 1, 1990, on the same grounds. 731 F.Supp. 1067 (S.D.Ga.). Both classes now appeal, requiring us to consider each of these grounds of dismissal. The defendants also

---

**2.** In 1986, Georgia Power may have had on hand as much as $117,903,014.58 worth of spare parts which had already been expensed but had not been used.

raise the question of whether the plaintiffs have stated a claim under RICO, asserting that the plaintiffs have suffered no cognizable injury. We address each issue in turn.

## II. DISCUSSION

■ Dismissal, as a question of law, is subject to plenary review by the appellate court. *See Bailey v. Carnival Cruise Lines, Inc.*, 774 F.2d 1577, 1578 (11th Cir. 1985). In reviewing the district court's dismissal of the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), this Court must read the facts alleged in the complaint in the light most favorable to the plaintiffs and may affirm only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

### A. *The Clear Statement Doctrine*

■ Both district courts grounded their dismissals of the plaintiffs' RICO claims on the "clear statement doctrine." This doctrine of statutory construction counsels that a federal court should not apply a federal statute to an area of traditional state concern unless Congress has articulated its desire in clear and definite language to alter the delicate balance between state and federal power by application of the statute to that area.[3] *See, e.g., McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 2881–82, 97 L.Ed.2d 292 (1987) (declining to apply a federal mail fraud statute in such a way that it might allow the federal government to set "standards of disclosure and good government for local and state officials" in the absence of clear and definite language that this was the intent of Congress). Courts, through the application of this doctrine, thus "remand" statutes to the legislative body for clarification, thereby requiring that Congress express its will deliberately and unambiguously on issues it perhaps could not have foreseen at the time the statute was originally enacted. The rationale for this approach to statutory construction lies in the admonition that "federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). Congress, however, may possess neither the resources nor the will to address every issue so "remanded" to it by the courts. *See, e.g., Potomac Elec. Power Co. v. Director, Office of Workers' Compensation Programs*, 449 U.S. 268, 284, 101 S.Ct. 509, 517, 66 L.Ed.2d 446 (1980) (noting the difficulty posed in continuing judicial interpretation of a statute which Congress had not chosen to reexamine in more than half a century). Moreover, the literalism which this approach engenders can lead to unnecessarily harsh results. *See, e.g., Mohasco Corp. v. Silver*, 447 U.S. 807, 828, 100 S.Ct. 2486, 2498, 65 L.Ed.2d 532 (1980) (Blackmun, J., dissenting) (noting that inequitable results come about when the court closes its eyes to alternative interpretations of statutes through "a strong-armed invocation of the plain-meaning rule"). Thus, though the "clear statement doctrine" wisely counsels us to be cautious in exercising federal judicial authority in an area of state concern, we must also take care not to frustrate the intent of Congress where it can reasonably be discerned.

The *Taffet* district court opinion only briefly mentioned this doctrine, citing *McNally* and stating simply that there is nothing in the language of RICO which specifically indicates that Congress intended RICO to apply to utilities. The *Carr* district court, however, discussed the doctrine more extensively through its explanation of *County of Suffolk v. Long Island Lighting Co.* (*LILCO*), 710 F.Supp. 1387 (E.D.N.Y.1989), *aff'd in part, rev'd in*

---

3. *See Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").

*part*, 907 F.2d 1295 (2d Cir.1990), a case holding RICO inapplicable to an electric company.

■ Application of the doctrine to the cases at bar begins with the assumption that ratemaking is traditionally a function of state agencies. Even though the plaintiffs are not asking the federal courts to invade the province of the state PSCs by setting the rates for electricity, the district courts reasoned that in order to award the ratepayers/plaintiffs damages they would have to figure out what the correct rate would have been had the defendants not defrauded the state PSCs. The district courts saw this as an infringement upon the state PSCs' traditional realm of control. Therefore, the district courts refused to apply RICO because the statute does not clearly state that it applies to utilities.

As the Second Circuit recently stated, however, in disagreeing with the district court in *LILCO*, the more basic rule of construction is that a court should never " 'pursue the theory of the dog that did not bark.' " *County of Suffolk v. Long Island Lighting Co. (LILCO)*, 907 F.2d 1295, 1306 (2d Cir.1990) (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980)). In other words, a court should not require "Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of the statute." *Id.* As the Second Circuit further pointed out, the Supreme Court has found the clear statement doctrine useful only where the statute was ambiguous on its face or where an application of the doctrine would suggest an interpretation of a statute which would be *in accord with* the statute's facial language and legislative history. *Id.* at 1306–07. RICO, on the other hand, is totally unambiguous on its face. *Id.* at 1308. The statute prohibits "any person" from violating its proscriptions. *See id.* at 1305; 18 U.S.C.A. § 1962. The statute then defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property." *See id.*; 18 U.S.C.A. § 1961(3). Therefore, because a utili-

ty is a legal entity which can hold property, RICO should apply to utilities. *Id.* at 1308.

Moreover, Congress has explicitly stated that RICO should be "liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, § 904(a), 84 Stat. 947 (1970). Those remedial purposes, according to the Supreme Court, are most evident in private causes of action brought by those injured as a result of racketeering. *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). The district courts in the cases at bar, consequently, have made an unwarranted expansion of the clear statement doctrine. We therefore find the doctrine inapplicable in the instant cases.

### B. *Burford Abstention*

Both the *Taffet* and *Carr* district courts also dismissed the plaintiffs' claims on the grounds of abstention. The *Taffet* court abstained under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The *Carr* court distinguished the more recent case of *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), which held that neither *Burford* nor *Younger* abstention applied to a case in which a utility sued a local ratemaking body in federal court. By implication, then, the *Carr* court also abstained under *Burford*.

■ In *NOPSI*, the Supreme Court distilled the "*Burford* doctrine" by explaining that where adequate state court review is available a federal court sitting in equity should abstain from interfering with proceedings of state administrative agencies: "(1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *NOPSI*, 109 S.Ct. at 2514 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800,

814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)).[4] The Court went on to emphasize that "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* (quoting *Colorado*, 424 U.S. at 815–16, 96 S.Ct. at 1245–46).

■ Under this test, it is clear that the claims should not be dismissed on the ground of *Burford* abstention. First, both actions primarily involve federal questions rather than state-law questions. These are essentially RICO actions with various pendent state-law fraud claims. Under Supreme Court precedent, the presence of a federal basis for jurisdiction raises the level of justification needed for the court to abstain under *Burford*. *Colorado*, 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21; *see also LILCO*, 907 F.2d at 1308 (holding that the district court could not abstain under *Burford* where all claims were federal). Moreover, in examining the state versus federal interest in *LILCO*, the Second Circuit found the fact that RICO offered treble damages and attorneys' fees, which the plaintiffs could not be awarded in any proceeding before the state PSC, demonstrated the gravity of the federal interest in the case. *LILCO*, 907 F.2d at 1309. The plaintiffs in the cases at bar likewise contend that they have no damages remedy before

their state PSCs. Though the PSCs can set rates prospectively, they cannot set rates retroactively or award damages.[5]

The issue of damages also demonstrates that the second prong of the *Burford* doctrine as enunciated in *NOPSI* does not apply in this case. That is, the federal court's award of damages will not cause disruption to the state's attempt to establish a coherent policy. The plaintiffs have requested treble damages. In order to determine the actual damages suffered, the district courts would have to determine what the rate would have been for the years in question had the utilities not defrauded the PSCs. This complex calculation would require an application of the appropriate accounting systems and various formulas the PSCs used to arrive at the allowable profit for the utility. The defendants complain that such a calculation would require that the district courts invade the province of the PSCs and cause disruption to state regulation by choosing among various accounting systems, a choice which the defendants assert the PSCs have not already made. But this argument ignores the fact that this is an appeal from the district courts' grants of Rule 12(b)(6) motions. The plaintiffs have alleged in their complaint that the proper accounting system to use has been pre-established by IRS regulations. *See Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir.1984) (stating that the decision to dismiss on Rule 12(b)(6) must be made on the

---

**4.** As a preliminary issue, plaintiffs argue that *Burford* cannot apply because the district courts are not here sitting in equity. Though abstention rulings premised upon principles of comity and federalism were originally developed in the context of actions seeking equitable relief, those principles have also been applied to actions seeking monetary damages. *See, e.g., Fair Assessment In Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 107–116, 102 S.Ct. 177, 181–86, 70 L.Ed.2d 271 (1981) (holding that comity barred taxpayers' action under § 1983 for damages against state tax officials). This argument, consequently, is meritless.

**5.** The defendants do not refute the plaintiffs' assertion that the PSCs cannot award damages. The PSCs function prospectively rather than retroactively. *See* Ala.Code § 37–1–97 (1975); Ga.Code Ann. § 46–2–25 (1982). In spite of this

fact, the defendants argue that the district courts should not hear this matter because the plaintiffs have not complained to the PSCs and therefore have not exhausted their administrative remedies. At oral argument, the defendants asserted that even though the state PSCs could not award damages, if complained to they might be able to concoct some civil remedy to redress the plaintiffs' injuries. The defendants, however, have not articulated what this remedy might be. Under this Court's precedent, exhaustion is not required "when the administrative remedy is inadequate ... or would not provide relief commensurate with the claim." *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1556 (11th Cir.1985). Because the PSCs can provide no retroactive relief or damages commensurate with the plaintiffs' claims, exhaustion of administrative remedies is not necessary.

basis of the allegations made on the face of the complaint), *aff'd,* 764 F.2d 1400 (11th Cir.1984), *cert. denied,* 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986). Thus, based on the allegations contained in the complaint, the calculation of damages does not necessarily cause the district courts to make policy choices which might disrupt the state regulatory scheme or usurp the position of the state PSC as ratemaker. The district courts would only have to apply a set of pre-established decisions and procedures to arrive at an estimation of what a prior rate would have been in the absence of fraud. Because the court would not be passing judgment upon a decision of the PSC or acting within the area of prospective ratemaking, there would be no disruption of state policy. *Burford,* therefore, does not apply to the cases at bar.

### C. *Primary Jurisdiction Doctrine*

■ The *Taffet* and *Carr* courts also based their decisions to dismiss the cases on the primary jurisdiction doctrine, citing *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956). *Western Pacific* held that whenever "enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* at 64, 77 S.Ct. at 165. The rationales for this doctrine are that (1) the agency has a superior expertise in the area in question, and (2) there is a need for uniformity in interpretation of a statute or regulation on a subject with which Congress has entrusted an agency. *Id.*

■ First, though the state PSCs clearly have expertise in ratemaking, the essential issue in this case is not what a

reasonable rate would be. Rather, the issue is whether the utilities committed fraud and violated RICO. The determination of what the rate would have been comes into play only at the point of determining damages.[6] Even at that point, the issue is not what rate would have been reasonable, but what part of the rate which the PSCs previously deemed reasonable was the result of the utilities' fraudulent acts. Second, as the Second Circuit found in *LILCO,* "[t]he uniformity rationale clearly does not support application of the [primary jurisdiction] doctrine in the federal question/state agency context." *LILCO,* 907 F.2d at 1310. In a situation in which an issue has been entrusted to one overarching federal agency, abstention by the federal courts allows that agency to develop uniform policies which in turn produce even-handed, uniform results. But where an issue lies within the domain of agencies created by the various states, uniformity is neither expected nor prized. Moreover, in the situation in which Congress creates a federal agency and entrusts it with a modicum of adjudicatory power over a subject matter, the agency's creation evinces a congressional intent to limit the judiciary's jurisdiction. However, a state, in creating a state agency, "cannot be said to shed any light on any determinative issue relating to congressional intent." *Id.* Consequently, the examination of the rationale behind the primary jurisdiction doctrine does not support application of the doctrine to the cases at bar. *See Western Pacific,* 352 U.S. at 64, 77 S.Ct. at 165 (stating "[n]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.").

---

6. The determination of damages in this case is a complex task. "Although 'speculation and guesswork' should not be the basis for ascertaining damages, ... damages need not be calculated by mathematical precision.... 'Any other rule would allow a wrongdoer to profit by his wrongdoing at the expense of his victim.'" *United States v. Killough,* 848 F.2d 1523, 1531

(11th Cir.1988) (quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946)) (citation omitted). Consequently, the assertion that the case should be barred because the district courts' calculations may not be mathematically precise has no merit.

### D. Filed Rate Doctrine

■ The "filed rate doctrine," in its most basic form, "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The doctrine originally arose out of cases interpreting the Interstate Commerce Act.[7] *See, e.g., Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). It has since, however, been applied to a variety of regulated industries. *Arkansas*, 453 U.S. at 577, 101 S.Ct. at 2930; *Maislin*, 110 S.Ct. at 2775 n. 9 (Stevens, J., dissenting). The purpose of the doctrine is (1) to preserve the regulating agency's authority to determine the reasonableness of rates and (2) to insure that the regulated entities charge only those rates which the agency has approved or been made aware of, as the law may require. *Arkansas*, 453 U.S. at 577–78, 101 S.Ct. at 2930–31. The uniformity of rates engendered by the doctrine prevents the regulated entities from discriminating among customers and stabilizes rates. *Maislin*, 110 S.Ct. at 2766. In accordance with this uniformity rationale, courts are barred from imposing a rate different from the rate filed with the regulating agency; the agency, moreover, cannot alter a rate retroactively. *Arkansas*, 453 U.S. at 578, 101 S.Ct. at 2930. Thus, courts are also generally considered without authority to award a party what might amount to a "retroactive rate increase based on speculation about what the [regulating agency] might have done had it been faced with the facts." *Id.* at 578–79, 101 S.Ct. at 2931 (disapproving of such an award as damages in a breach of contract case).

The Supreme Court has applied the doctrine even in cases in which one party allegedly defrauded another. *See, e.g., Montana–Dakota Util. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951) (holding that where two utilities with interlocking directorates reached an agreement as to the rates that they would charge between them and received approval of the regulating agency, the Court had no authority to second-guess the agency's judgment that the rate and arrangement were reasonable even though one utility had possibly defrauded the other). The Court, however, has never applied the doctrine when faced with a claim that a fraud has been committed upon the agency itself. *See H.J., Inc.*, 109 S.Ct. at 2898 n. 1 (declining to address whether the filed rate doctrine barred a RICO claim alleging that telephone utility bribed officials in state agency to get higher rates); *Arkansas*, 453 U.S. at 583 n. 13, 101 S.Ct. at 2933 n. 13 ("We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct."); *Southern Union Co. v. Federal Energy Regulatory Comm'n*, 857 F.2d 812, 818 (D.C.Cir. 1988) (recognizing that the *Arkansas* case opened the door to an equitable exception to the filed rate doctrine in cases of fraudulent conduct), *cert. denied*, — U.S. —, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990).

The plaintiffs argue that Eleventh Circuit precedent has rejected application of the filed rate doctrine in a situation in which a fraud before the regulating agency threatened to undermine the integrity of the regulatory process. In *Woods Exploration & Producing Co., Inc. v. Aluminum Co. of Am.*, 438 F.2d 1286 (5th Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), the parties were owners of gas producing wells located in the same field. A state agency determined how much gas each owner would be allowed to produce each month based on reports and projections submitted to the agency by the producers. The plaintiffs alleged that the defendants had conspired to subvert the agency's allotment process by submitting false reports and projections. The court held that the plaintiffs could

---

7. In *Maislin Indus., Inc. v. Primary Steel, Inc.*, — U.S. —, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), the Supreme Court reviewed the origins of the doctrine, explaining that the doctrine's rigid approach was necessary to eradicate the practices of shipping clerks in the early twentieth century who intentionally misquoted rates to favored customers as a means of offering special rebates or discounts. *Id.* 110 S.Ct. at 2766.

bring an antitrust action against the defendants based on these attempts to subvert the functioning of the regulatory scheme. *Id.* at 1303. However, because the *Woods* court did not specifically consider the filed rate doctrine, its precedential value on the filed rate issue is questionable.

■ Because of the paucity of case law on this issue,[8] the best route is to revisit the policy behind the doctrine. As articulated in *Arkansas* and *Maislin, supra,* that policy is to preserve the regulating agency's authority over the setting of reasonable rates. Properly set rates then result in stabilization and uniformity and prevent discrimination among customers. The plaintiffs have alleged that the defendants actively worked to subvert the rate-setting process. The possibility of a RICO action against a utility which defrauds its state PSC creates great incentive for that utility to present its PSC with accurate and truthful information upon which the PSC may base its rate decisions. With the integrity of the regulatory process thus fortified, the rates set by the PSCs would be more stable and could be better trusted to prevent discrimination among customers. Consequently, permitting an action for damages under RICO against the perpetrator of the fraud would enhance rather than infringe upon the PSCs' authority to set reasonable and uniform rates. Therefore, application of the filed rate doctrine in the cases at bar is not appropriate.

### E. *The Claim for Relief Under RICO*

■ The defendants assert that plaintiffs have not stated a claim under RICO because they have not alleged a legally cognizable injury and have not alleged sufficient predicate acts.

Section 1964(c) of RICO requires that the plaintiff be injured in his business or property. The defendants point out that the Supreme Court looks to the Clayton Act, upon which RICO was modeled, as an interpretive aid. *Sedima,* 473 U.S. at 486–90, 105 S.Ct. at 3279–82. The Court, in upholding an application of the filed rate doctrine in the antitrust area, has stated that an antitrust plaintiff has no legal right to a tariff other than that filed with the Interstate Commerce Commission ("ICC"); the plaintiff therefore does not allege an antitrust injury merely by alleging that the rate approved by the ICC resulted from a rate-setting conspiracy. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 416, 106 S.Ct. 1922, 1926, 90 L.Ed.2d 413 (1986). By analogy, then, defendants argue that plaintiffs in the instant cases have alleged no cognizable RICO injury in claiming that the rate charged by the utilities resulted from fraud.

This argument has merit only if one accepts the defendants' argument that the filed rate doctrine should apply to this case. In *Square D,* the ICC did not set the tariffs but merely published them. *Id.* at 413, 106 S.Ct. at 1925. The ICC was neither given false information nor defrauded. Rather, the basis of the claim in *Square D* was that a group of motor carriers had conspired together in setting the rates which they subsequently filed with the ICC. In this situation, the Court found that the legal tariff was that filed with the ICC regardless of the allegations of conspiracy. Therefore, under the filed rate doctrine, the plaintiff had no cognizable right to pay a tariff other than the one filed. Because

---

**8.** The only reported case which addresses the filed rate doctrine specifically in the RICO context is *H.J., Inc. v. Northwestern Bell Tel. Co.,* 734 F.Supp. 879 (D.Minn.1990). This case went to the Supreme Court on the issue of what constitutes a "pattern" of racketeering for RICO purposes. The Supreme Court did not reach the filed rate issue. *H.J., Inc.,* 109 S.Ct. at 2898 n. 1. On remand, the district court found the suit barred by the filed rate doctrine. The state PSC had prior to remand by the Supreme Court recalculated the rate in question for purposes of a pending state investigation. This recalcula-

tion eradicated the need for the federal court to become involved in the complex calculations required to arrive at a figure for damages. The district court, however, feared that even the availability of RICO treble damages might impermissibly influence the manner in which the state PSC set rates. *H.J., Inc.,* 734 F.Supp. at 886. Thus, relying on the district court opinion in *LILCO* (since disagreed with by the Second Circuit) and the district court opinion in *Carr* (here under review), the *H.J.* district court on remand dismissed the case.

the filed rate doctrine does not apply to a situation, such as that presented in the cases at bar, in which the defendants have fraudulently subverted the ratemaking process itself by presenting the agency with false information, the rate which resulted from fraud cannot be said to be the legal one. Moreover, the plaintiffs cannot be said to have no cognizable right to pay anything but the fraud-induced rate. The cognizable injury is therefore money lost as a result of fraud upon the state agency. Money lost by customers as a result of antitrust violations is generally considered an injury to "business or property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). By analogy to antitrust law, then, the plaintiffs' injury is cognizable under RICO.

To state a claim under RICO, the plaintiffs must allege that the defendants engaged in racketeering activity which is defined under § 1961(1) of RICO to mean specified predicate acts, including mail fraud and wire fraud. The plaintiffs in both cases at bar have alleged use of the mail to perpetrate the fraud. The defendants, however, claim that this allegation is insufficient because they believe the plaintiffs claim only deprivation of intangible, non-cognizable rights to reasonable rates and fraud-free PSC proceedings. They argue that neither of these intangible rights supports a prosecution for mail fraud. To prove mail fraud, they argue, the plaintiffs must show deprivation of tangible property or money. This argument has merit only if one accepts defendants' argument that plaintiffs have not sustained a tangible, cognizable injury under RICO. As discussed above, however, we reject the application of the filed rate doctrine to the facts alleged in the instant cases and find that the plaintiffs have alleged a tangible, cognizable RICO injury. Accordingly, the injury alleged, loss of money, may serve as the basis for a mail fraud prosecution which is in turn a predicate act under RICO.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district courts' dismissals of the plaintiffs' claims in both *Taffet* and *Carr* and REMAND for trials on the merits.

BIRCH, Circuit Judge, dissenting:

For the reasons that follow, I respectfully dissent. I would affirm the district courts' decisions to dismiss the plaintiffs' RICO claims. I believe that the primary jurisdiction doctrine and the filed rate doctrine, discussed in parts II(C) and (D) of the majority opinion, prohibit application of the RICO statute to public utilities after a rate has been approved by the state PSC. The majority relies upon the Second Circuit's recent decision in *County of Suffolk v. Long Island Lighting Co. (LILCO)*, 907 F.2d 1295 (2d Cir.1990), but that opinion did not explicitly consider the filed rate doctrine. Moreover, to the extent that the *LILCO* decision may have dealt with the filed rate doctrine by implication, I believe that the Second Circuit has created an unwarranted and unprecedented exception to the existing law on this subject.